(Slip Opinion)     OCTOBER TERM, 2012     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KOONTZ *v.* ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

### CERTIORARI TO THE SUPREME COURT OF FLORIDA

No. 11–1447.   Argued January 15, 2013—Decided June 25, 2013

Coy Koontz, Sr., whose estate is represented here by petitioner, sought
permits to develop a section of his property from respondent St.
Johns River Water Management District (District), which, consistent
with Florida law, requires permit applicants wishing to build on wet-
lands to offset the resulting environmental damage.  Koontz offered
to mitigate the environmental effects of his development proposal by
deeding to the District a conservation easement on nearly three-
quarters of his property.  The District rejected Koontz's proposal and
informed him that it would approve construction only if he (1) re-
duced the size of his development and, *inter alia*, deeded to the Dis-
trict a conservation easement on the resulting larger remainder of his
property or (2) hired contractors to make improvements to District-
owned wetlands several miles away.  Believing the District's de-
mands to be excessive in light of the environmental effects his pro-
posal would have caused, Koontz filed suit under a state law that
provides money damages for agency action that is an "unreasonable
exercise of the state's police power constituting a taking without just
compensation."

  The trial court found the District's actions unlawful because they
failed the requirements of *Nollan* v. *California Coastal Comm'n*, 483
U. S. 825, and *Dolan* v. *City of Tigard*, 512 U. S. 374.  Those cases
held that the government may not condition the approval of a land-
use permit on the owner's relinquishment of a portion of his property
unless there is a nexus and rough proportionality between the gov-
ernment's demand and the effects of the proposed land use.  The Dis-
trict Court of Appeal affirmed, but the State Supreme Court reversed
on two grounds.  First, it held that petitioner's claim failed because,
unlike in *Nollan* or *Dolan*, the District *denied* the application.  Se-

cond, the State Supreme Court held that a demand for money cannot give rise to a claim under *Nollan* and *Dolan*.

*Held*:

1. The government's demand for property from a land-use permit applicant must satisfy the *Nollan/Dolan* requirements even when it denies the permit. Pp. 6–14.

(a) The unconstitutional conditions doctrine vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up, and *Nollan* and *Dolan* represent a special application of this doctrine that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits. The standard set out in *Nollan* and *Dolan* reflects the danger of governmental coercion in this context while accommodating the government's legitimate need to offset the public costs of development through land use exactions. *Dolan, supra,* at 391; *Nollan, supra,* at 837. Pp. 6–8.

(b) The principles that undergird *Nollan* and *Dolan* do not change depending on whether the government *approves* a permit on the condition that the applicant turn over property or *denies* a permit because the applicant refuses to do so. Recognizing such a distinction would enable the government to evade the *Nollan/Dolan* limitations simply by phrasing its demands for property as conditions precedent to permit approval. This Court's unconstitutional conditions cases have long refused to attach significance to the distinction between conditions precedent and conditions subsequent. See, *e.g.*, *Frost & Frost Trucking Co.* v. *Railroad Comm'n of Cal.*, 271 U. S. 583, 592–593. It makes no difference that no property was actually taken in this case. Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation. Nor does it matter that the District might have been able to deny Koontz's application outright without giving him the option of securing a permit by agreeing to spend money improving public lands. It is settled that the unconstitutional conditions doctrine applies even when the government threatens to withhold a gratuitous benefit. See *e.g.*, *United States* v. *American Library Assn., Inc.*, 539 U. S. 194, 210. Pp. 8–11.

(c) The District concedes that the denial of a permit could give rise to a valid *Nollan/Dolan* claim, but urges that this Court should not review this particular denial because Koontz sued in the wrong court, for the wrong remedy, and at the wrong time. Most of its arguments raise questions of state law. But to the extent that respondent alleges a federal obstacle to adjudication of petitioner's claim, the Florida courts can consider respondent's arguments in the first in-

stance on remand. Finally, the District errs in arguing that because it gave Koontz another avenue to obtain permit approval, this Court need not decide whether its demand for offsite improvements satisfied *Nollan* and *Dolan*. Had Koontz been offered at least one alternative that satisfied *Nollan* and *Dolan*, he would not have been subjected to an unconstitutional condition. But the District's offer to approve a less ambitious project does not obviate the need to apply *Nollan* and *Dolan* to the conditions it imposed on its approval of the project Koontz actually proposed. Pp. 12–14.

2. The government's demand for property from a land-use permit applicant must satisfy the *Nollan/Dolan* requirements even when its demand is for money. Pp. 14–22.

(a) Contrary to respondent's argument, *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, where five Justices concluded that the Takings Clause does not apply to government-imposed financial obligations that "d[o] not operate upon or alter an identified property interest," *id.*, at 540 (KENNEDY, J., concurring in judgment and dissenting in part), does not control here, where the demand for money did burden the ownership of a specific parcel of land. Because of the direct link between the government's demand and a specific parcel of real property, this case implicates the central concern of *Nollan* and *Dolan*: the risk that the government may deploy its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed use of the property at issue. Pp. 15–18.

(b) The District argues that if monetary exactions are subject to *Nollan/Dolan* scrutiny, then there will be no principled way of distinguishing impermissible land-use exactions from property taxes. But the District exaggerates both the extent to which that problem is unique to the land-use permitting context and the practical difficulty of distinguishing between the power to tax and the power to take by eminent domain. It is beyond dispute that "[t]axes and user fees . . . are not 'takings,'" *Brown* v. *Legal Foundation of Wash.*, 538 U. S. 216, 243, n. 2, yet this Court has repeatedly found takings where the government, by confiscating financial obligations, achieved a result that could have been obtained through taxation, *e.g.*, *id.*, at 232. Pp. 18–21.

(c) The Court's holding that monetary exactions are subject to scrutiny under *Nollan* and *Dolan* will not work a revolution in land use law or unduly limit the discretion of local authorities to implement sensible land use regulations. The rule that *Nollan* and *Dolan* apply to monetary exactions has been the settled law in some of our Nation's most populous States for many years, and the protections of those cases are often redundant with the requirements of state law.

   Pp. 21–22.

77 So. 3d 1220, reversed and remanded.

   ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–1447

COY A. KOONTZ, JR., PETITIONER *v.* ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[June 25, 2013]

JUSTICE ALITO delivered the opinion of the Court.

Our decisions in *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), and *Dolan* v. *City of Tigard*, 512 U. S. 374 (1994), provide important protection against the misuse of the power of land-use regulation. In those cases, we held that a unit of government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a "nexus" and "rough proportionality" between the government's demand and the effects of the proposed land use. In this case, the St. Johns River Water Management District (District) believes that it circumvented *Nollan* and *Dolan* because of the way in which it structured its handling of a permit application submitted by Coy Koontz, Sr., whose estate is represented in this Court by Coy Koontz, Jr.[1] The District did not approve his application on the condition that he surrender an interest in his land. Instead, the District, after suggesting that he could obtain approval by signing over such an interest, denied his application because he refused to yield. The Florida Supreme Court

---

[1] For ease of reference, this opinion refers to both men as "petitioner."

blessed this maneuver and thus effectively interred those important decisions.  Because we conclude that *Nollan* and *Dolan* cannot be evaded in this way, the Florida Supreme Court's decision must be reversed.

I

A

In 1972, petitioner purchased an undeveloped 14.9-acre tract of land on the south side of Florida State Road 50, a divided four-lane highway east of Orlando.  The property is located less than 1,000 feet from that road's intersection with Florida State Road 408, a tolled expressway that is one of Orlando's major thoroughfares.

A drainage ditch runs along the property's western edge, and high-voltage power lines bisect it into northern and southern sections.  The combined effect of the ditch, a 100-foot wide area kept clear for the power lines, the highways, and other construction on nearby parcels is to isolate the northern section of petitioner's property from any other undeveloped land.  Although largely classified as wetlands by the State, the northern section drains well; the most significant standing water forms in ruts in an unpaved road used to access the power lines.  The natural topography of the property's southern section is somewhat more diverse, with a small creek, forested uplands, and wetlands that sometimes have water as much as a foot deep.  A wildlife survey found evidence of animals that often frequent developed areas: raccoons, rabbits, several species of bird, and a turtle.  The record also indicates that the land may be a suitable habitat for opossums.

The same year that petitioner purchased his property, Florida enacted the Water Resources Act, which divided the State into five water management districts and authorized each district to regulate "construction that connects to, draws water from, drains water into, or is placed in or across the waters in the state."  1972 Fla. Laws ch.

72–299, pt. IV, §1(5), pp. 1115, 1116 (codified as amended at Fla. Stat. §373.403(5) (2010)). Under the Act, a landowner wishing to undertake such construction must obtain from the relevant district a Management and Storage of Surface Water (MSSW) permit, which may impose "such reasonable conditions" on the permit as are "necessary to assure" that construction will "not be harmful to the water resources of the district." 1972 Fla. Laws §4(1), at 1118 (codified as amended at Fla. Stat. §373.413(1)).

In 1984, in an effort to protect the State's rapidly diminishing wetlands, the Florida Legislature passed the Warren S. Henderson Wetlands Protection Act, which made it illegal for anyone to "dredge or fill in, on, or over surface waters" without a Wetlands Resource Management (WRM) permit. 1984 Fla. Laws ch. 84–79, pt. VIII, §403.905(1), pp. 204–205. Under the Henderson Act, permit applicants are required to provide "reasonable assurance" that proposed construction on wetlands is "not contrary to the public interest," as defined by an enumerated list of criteria. See Fla. Stat. §373.414(1). Consistent with the Henderson Act, the St. Johns River Water Management District, the district with jurisdiction over petitioner's land, requires that permit applicants wishing to build on wetlands offset the resulting environmental damage by creating, enhancing, or preserving wetlands elsewhere.

Petitioner decided to develop the 3.7-acre northern section of his property, and in 1994 he applied to the District for MSSW and WRM permits. Under his proposal, petitioner would have raised the elevation of the northernmost section of his land to make it suitable for a building, graded the land from the southern edge of the building site down to the elevation of the high-voltage electrical lines, and installed a dry-bed pond for retaining and gradually releasing stormwater runoff from the building and its parking lot. To mitigate the environmental

effects of his proposal, petitioner offered to foreclose any possible future development of the approximately 11-acre southern section of his land by deeding to the District a conservation easement on that portion of his property.

The District considered the 11-acre conservation easement to be inadequate, and it informed petitioner that it would approve construction only if he agreed to one of two concessions. First, the District proposed that petitioner reduce the size of his development to 1 acre and deed to the District a conservation easement on the remaining 13.9 acres. To reduce the development area, the District suggested that petitioner could eliminate the dry-bed pond from his proposal and instead install a more costly subsurface stormwater management system beneath the building site. The District also suggested that petitioner install retaining walls rather than gradually sloping the land from the building site down to the elevation of the rest of his property to the south.

In the alternative, the District told petitioner that he could proceed with the development as proposed, building on 3.7 acres and deeding a conservation easement to the government on the remainder of the property, if he also agreed to hire contractors to make improvements to District-owned land several miles away. Specifically, petitioner could pay to replace culverts on one parcel or fill in ditches on another. Either of those projects would have enhanced approximately 50 acres of District-owned wetlands. When the District asks permit applicants to fund offsite mitigation work, its policy is never to require any particular offsite project, and it did not do so here. Instead, the District said that it "would also favorably consider" alternatives to its suggested offsite mitigation projects if petitioner proposed something "equivalent." App. 75.

Believing the District's demands for mitigation to be excessive in light of the environmental effects that his

building proposal would have caused, petitioner filed suit in state court. Among other claims, he argued that he was entitled to relief under Fla. Stat. §373.617(2), which allows owners to recover "monetary damages" if a state agency's action is "an unreasonable exercise of the state's police power constituting a taking without just compensation."

B

The Florida Circuit Court granted the District's motion to dismiss on the ground that petitioner had not adequately exhausted his state-administrative remedies, but the Florida District Court of Appeal for the Fifth Circuit reversed. On remand, the State Circuit Court held a 2-day bench trial. After considering testimony from several experts who examined petitioner's property, the trial court found that the property's northern section had already been "seriously degraded" by extensive construction on the surrounding parcels. App. to Pet. for Cert. D–3. In light of this finding and petitioner's offer to dedicate nearly three-quarters of his land to the District, the trial court concluded that any further mitigation in the form of payment for offsite improvements to District property lacked both a nexus and rough proportionality to the environmental impact of the proposed construction. *Id.*, at D–11. It accordingly held the District's actions unlawful under our decisions in *Nollan* and *Dolan*.

The Florida District Court affirmed, 5 So. 3d 8 (2009), but the State Supreme Court reversed, 77 So. 3d 1220 (2011). A majority of that court distinguished *Nollan* and *Dolan* on two grounds. First, the majority thought it significant that in this case, unlike *Nollan* or *Dolan*, the District did not approve petitioner's application on the condition that he accede to the District's demands; instead, the District denied his application because he refused to make concessions. 77 So. 3d, at 1230. Second, the majority drew a distinction between a demand for an

interest in real property (what happened in *Nollan* and *Dolan*) and a demand for money. 77 So. 3d, at 1229–1230. The majority acknowledged a division of authority over whether a demand for money can give rise to a claim under *Nollan* and *Dolan*, and sided with those courts that have said it cannot. 77 So. 3d, at 1229–1230. Compare, *e.g.*, *McClung* v. *Sumner*, 548 F. 3d 1219, 1228 (CA9 2008), with *Ehrlich* v. *Culver City*, 12 Cal. 4th 854, 876, 911 P. 2d 429, 444 (1996); *Flower Mound* v. *Stafford Estates Ltd. Partnership*, 135 S. W. 3d 620, 640–641 (Tex. 2004). Two justices concurred in the result, arguing that petitioner had failed to exhaust his administrative remedies as required by state law before bringing an inverse condemnation suit that challenges the propriety of an agency action. 77 So. 3d, at 1231–1232; see *Key Haven Associated Enterprises, Inc.* v. *Board of Trustees of Internal Improvement Trust Fund*, 427 So. 2d 153, 159 (Fla. 1982).

Recognizing that the majority opinion rested on a question of federal constitutional law on which the lower courts are divided, we granted the petition for a writ of certiorari, 568 U. S. ___ (2012), and now reverse.

## II
### A

We have said in a variety of contexts that "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540, 545 (1983). See also, *e.g., Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 59–60 (2006); *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 78 (1990). In *Perry* v. *Sindermann*, 408 U. S. 593 (1972), for example, we held that a public college would violate a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration. And in *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250

(1974), we concluded that a county impermissibly burdened the right to travel by extending healthcare benefits only to those indigent sick who had been residents of the county for at least one year. Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up.

*Nollan* and *Dolan* "involve a special application" of this doctrine that protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits. *Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. 528, 547 (2005); *Dolan*, 512 U. S., at 385 (invoking "the well-settled doctrine of 'unconstitutional conditions'"). Our decisions in those cases reflect two realities of the permitting process. The first is that land-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take. By conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation. See *id.*, at 384; *Nollan*, 483 U. S., at 831. So long as the building permit is more valuable than any just compensation the owner could hope to receive for the right-of-way, the owner is likely to accede to the government's demand, no matter how unreasonable. Extortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them.

A second reality of the permitting process is that many proposed land uses threaten to impose costs on the public that dedications of property can offset. Where a building

proposal would substantially increase traffic congestion, for example, officials might condition permit approval on the owner's agreement to deed over the land needed to widen a public road.  Respondent argues that a similar rationale justifies the exaction at issue here: petitioner's proposed construction project, it submits, would destroy wetlands on his property, and in order to compensate for this loss, respondent demands that he enhance wetlands elsewhere.  Insisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy, and we have long sustained such regulations against constitutional attack.  See *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365 (1926).

*Nollan* and *Dolan* accommodate both realities by allowing the government to condition approval of a permit on the dedication of property to the public so long as there is a "nexus" and "rough proportionality" between the property that the government demands and the social costs of the applicant's proposal. *Dolan*, *supra*, at 391; *Nollan*, 483 U. S., at 837.  Our precedents thus enable permitting authorities to insist that applicants bear the full costs of their proposals while still forbidding the government from engaging in "out-and-out . . . extortion" that would thwart the Fifth Amendment right to just compensation.  *Ibid.* (internal quotation marks omitted).  Under *Nollan* and *Dolan* the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts.

## B

The principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government *approves* a permit on the condition that the ap-

plicant turn over property or *denies* a permit because the applicant refuses to do so. We have often concluded that denials of governmental benefits were impermissible under the unconstitutional conditions doctrine. See, *e.g., Perry*, 408 U. S., at 597 (explaining that the government "*may not deny* a benefit to a person on a basis that infringes his constitutionally protected interests" (emphasis added)); *Memorial Hospital*, 415 U. S. 250 (finding unconstitutional condition where government denied healthcare benefits). In so holding, we have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.

A contrary rule would be especially untenable in this case because it would enable the government to evade the limitations of *Nollan* and *Dolan* simply by phrasing its demands for property as conditions precedent to permit approval. Under the Florida Supreme Court's approach, a government order stating that a permit is "approved if" the owner turns over property would be subject to *Nollan* and *Dolan*, but an identical order that uses the words "denied until" would not. Our unconstitutional conditions cases have long refused to attach significance to the distinction between conditions precedent and conditions subsequent. See *Frost & Frost Trucking Co.* v. *Railroad Comm'n of Cal.*, 271 U. S. 583, 592–593 (1926) (invalidating regulation that required the petitioner to give up a constitutional right "as a condition precedent to the enjoyment of a privilege"); *Southern Pacific Co.* v. *Denton*, 146 U. S. 202, 207 (1892) (invalidating statute "requiring the corporation, as a condition precedent to obtaining a permit to do business within the State, to surrender a right and privilege secured to it by the Constitution"). See also *Flower Mound*, 135 S. W. 3d, at 639 ("The government

cannot sidestep constitutional protections merely by re-
phrasing its decision from 'only if' to 'not unless'"). To do
so here would effectively render *Nollan* and *Dolan* a dead
letter.

The Florida Supreme Court puzzled over how the gov-
ernment's demand for property can violate the Takings
Clause even though "'no property of any kind was ever
taken,'" 77 So. 3d, at 1225 (quoting 5 So. 3d, at 20 (Griffin,
J., dissenting)); see also 77 So. 3d, at 1229–1230, but the
unconstitutional conditions doctrine provides a ready
answer. Extortionate demands for property in the land-
use permitting context run afoul of the Takings Clause not
because they take property but because they impermis-
sibly burden the right not to have property taken without
just compensation. As in other unconstitutional condi-
tions cases in which someone refuses to cede a constitutional
right in the face of coercive pressure, the impermissible
denial of a governmental benefit is a constitutionally cog-
nizable injury.

Nor does it make a difference, as respondent suggests,
that the government might have been able to deny peti-
tioner's application outright without giving him the option
of securing a permit by agreeing to spend money to im-
prove public lands. See *Penn Central Transp. Co.* v. *New
York City*, 438 U. S. 104 (1978). Virtually all of our uncon-
stitutional conditions cases involve a gratuitous govern-
mental benefit of some kind. See, *e.g.*, *Regan*, 461 U. S.
540 (tax benefits); *Memorial Hospital*, 415 U. S. 250
(healthcare); *Perry*, 408 U. S. 593 (public employment);
*United States* v. *Butler*, 297 U. S. 1, 71 (1936) (crop pay-
ments); *Frost*, *supra* (business license). Yet we have re-
peatedly rejected the argument that if the government
need not confer a benefit at all, it can withhold the benefit
because someone refuses to give up constitutional rights.
*E.g., United States* v. *American Library Assn., Inc.*, 539
U. S. 194, 210 (2003) ("[T]he government may not deny a

benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech *even if he has no entitlement to that benefit*" (emphasis added and internal quotation marks omitted)); *Wieman* v. *Updegraff*, 344 U. S. 183, 191 (1952) (explaining in unconstitutional conditions case that to focus on "the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue"). Even if respondent would have been entirely within its rights in denying the permit for some other reason, that greater authority does not imply a lesser power to condition permit approval on petitioner's forfeiture of his constitutional rights. See *Nollan*, 483 U. S., at 836–837 (explaining that "[t]he evident constitutional propriety" of prohibiting a land use "disappears . . . if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition").

That is not to say, however, that there is *no* relevant difference between a consummated taking and the denial of a permit based on an unconstitutionally extortionate demand. Where the permit is denied and the condition is never imposed, nothing has been taken. While the unconstitutional conditions doctrine recognizes that this *burdens* a constitutional right, the Fifth Amendment mandates a particular *remedy*—just compensation—only for takings. In cases where there is an excessive demand but no taking, whether money damages are available is not a question of federal constitutional law but of the cause of action—whether state or federal—on which the landowner relies. Because petitioner brought his claim pursuant to a state law cause of action, the Court has no occasion to discuss what remedies might be available for a *Nollan/Dolan* unconstitutional conditions violation either here or in other cases.

### C

At oral argument, respondent conceded that the denial of a permit could give rise to a valid claim under *Nollan* and *Dolan*, Tr. of Oral Arg. 33–34, but it urged that we should not review the particular denial at issue here because petitioner sued in the wrong court, for the wrong remedy, and at the wrong time. Most of respondent's objections to the posture of this case raise questions of Florida procedure that are not ours to decide. See *Mullaney* v. *Wilbur*, 421 U. S. 684, 691 (1975); *Murdock* v. *Memphis*, 20 Wall. 590, 626 (1875). But to the extent that respondent suggests that the posture of this case creates some federal obstacle to adjudicating petitioner's unconstitutional conditions claim, we remand for the Florida courts to consider that argument in the first instance.

Respondent argues that we should affirm because, rather than suing for damages in the Florida trial court as authorized by Fla. Stat. §373.617, petitioner should have first sought judicial review of the denial of his permit in the Florida appellate court under the State's Administrative Procedure Act, see §§120.68(1), (2) (2010). The Florida Supreme Court has said that the appellate court is the "proper forum to resolve" a "claim that an agency has *applied* a . . . statute or rule in such a way that the aggrieved party's constitutional rights have been violated," *Key Haven Associated Enterprises,* 427 So. 2d, at 158, and respondent has argued throughout this litigation that petitioner brought his unconstitutional conditions claim in the wrong forum. Two members of the Florida Supreme Court credited respondent's argument, 77 So. 3d, at 1231–1232, but four others refused to address it. We decline respondent's invitation to second-guess a State Supreme Court's treatment of its own procedural law.

Respondent also contends that we should affirm because petitioner sued for damages but is at most entitled to an injunction ordering that his permit issue without any

conditions. But we need not decide whether *federal* law authorizes plaintiffs to recover damages for unconstitutional conditions claims predicated on the Takings Clause because petitioner brought his claim under *state* law. Florida law allows property owners to sue for "damages" whenever a state agency's action is "an unreasonable exercise of the state's police power constituting a taking without just compensation." Fla. Stat. Ann. §373.617. Whether that provision covers an unconstitutional conditions claim like the one at issue here is a question of state law that the Florida Supreme Court did not address and on which we will not opine.

For similar reasons, we decline to reach respondent's argument that its demands for property were too indefinite to give rise to liability under *Nollan* and *Dolan*. The Florida Supreme Court did not reach the question whether respondent issued a demand of sufficient concreteness to trigger the special protections of *Nollan* and *Dolan*. It relied instead on the Florida District Court of Appeals' characterization of respondent's behavior as a demand for *Nollan/Dolan* purposes. See 77 So. 3d, at 1224 (quoting 5 So. 3d, at 10). Whether that characterization is correct is beyond the scope of the questions the Court agreed to take up for review. If preserved, the issue remains open on remand for the Florida Supreme Court to address. This Court therefore has no occasion to consider how concrete and specific a demand must be to give rise to liability under *Nollan* and *Dolan*.

Finally, respondent argues that we need not decide whether its demand for offsite improvements satisfied *Nollan* and *Dolan* because it gave petitioner another avenue for obtaining permit approval. Specifically, respondent said that it would have approved a revised permit application that reduced the footprint of petitioner's proposed construction site from 3.7 acres to 1 acre and placed a conservation easement on the remaining 13.9

acres of petitioner's land.  Respondent argues that regard-
less of whether its demands for offsite mitigation satisfied
*Nollan* and *Dolan*, we must separately consider each of
petitioner's options, one of which did not require any of the
offsite work the trial court found objectionable.

Respondent's argument is flawed because the option to
which it points—developing only 1 acre of the site and
granting a conservation easement on the rest—involves
the same issue as the option to build on 3.7 acres and
perform offsite mitigation.  We agree with respondent
that, so long as a permitting authority offers the landowner
at least one alternative that would satisfy *Nollan* and
*Dolan*, the landowner has not been subjected to an uncon-
stitutional condition.  But respondent's suggestion that we
should treat its offer to let petitioner build on 1 acre as
an alternative to offsite mitigation misapprehends the gov-
ernmental benefit that petitioner was denied.  Petitioner
sought to develop 3.7 acres, but respondent in effect told
petitioner that it would not allow him to build on 2.7 of
those acres unless he agreed to spend money improving
public lands.  Petitioner claims that he was wrongfully
denied a permit to build on those 2.7 acres.  For that
reason, respondent's offer to approve a less ambitious
building project does not obviate the need to determine
whether the demand for offsite mitigation satisfied *Nollan*
and *Dolan*.

                            III

We turn to the Florida Supreme Court's alternative
holding that petitioner's claim fails because respondent
asked him to spend money rather than give up an ease-
ment on his land.  A predicate for any unconstitutional
conditions claim is that the government could not have
constitutionally ordered the person asserting the claim to
do what it attempted to pressure that person into doing.
See *Rumsfeld*, 547 U. S., at 59–60.  For that reason, we

began our analysis in both *Nollan* and *Dolan* by observing that if the government had directly seized the easements it sought to obtain through the permitting process, it would have committed a *per se* taking. See *Dolan*, 512 U. S., at 384; *Nollan*, 483 U. S., at 831. The Florida Supreme Court held that petitioner's claim fails at this first step because the subject of the exaction at issue here was money rather than a more tangible interest in real property. 77 So. 3d, at 1230. Respondent and the dissent take the same position, citing the concurring and dissenting opinions in *Eastern Enterprises* v. *Apfel*, 524 U. S. 498 (1998), for the proposition that an obligation to spend money can never provide the basis for a takings claim. See *post,* at 5–8 (opinion of KAGAN, J.).

We note as an initial matter that if we accepted this argument it would be very easy for land-use permitting officials to evade the limitations of *Nollan* and *Dolan*. Because the government need only provide a permit applicant with one alternative that satisfies the nexus and rough proportionality standards, a permitting authority wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value. Such so-called "in lieu of" fees are utterly commonplace, Rosenberg, The Changing Culture of American Land Use Regulation: Paying for Growth with Impact Fees, 59 S. M. U. L. Rev. 177, 202–203 (2006), and they are functionally equivalent to other types of land use exactions. For that reason and those that follow, we reject respondent's argument and hold that so-called "monetary exactions" must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*.

A

In *Eastern Enterprises*, *supra*, the United States retroactively imposed on a former mining company an obliga-

tion to pay for the medical benefits of retired miners and their families. A four-Justice plurality concluded that the statute's imposition of retroactive financial liability was so arbitrary that it violated the Takings Clause. *Id.,* at 529–537. Although JUSTICE KENNEDY concurred in the result on due process grounds, he joined four other Justices in dissent in arguing that the Takings Clause does not apply to government-imposed financial obligations that "d[o] not operate upon or alter an identified property interest." *Id.,* at 540 (opinion concurring in judgment and dissenting in part); see *id.,* at 554–556 (BREYER, J., dissenting) ("The 'private property' upon which the [Takings] Clause traditionally has focused is a specific interest in physical or intellectual property"). Relying on the concurrence and dissent in *Eastern Enterprises*, respondent argues that a requirement that petitioner spend money improving public lands could not give rise to a taking.

Respondent's argument rests on a mistaken premise. Unlike the financial obligation in *Eastern Enterprises*, the demand for money at issue here did "operate upon . . . an identified property interest" by directing the owner of a particular piece of property to make a monetary payment. *Id.*, at 540 (opinion of KENNEDY, J.). In this case, unlike *Eastern Enterprises,* the monetary obligation burdened petitioner's ownership of a specific parcel of land. In that sense, this case bears resemblance to our cases holding that the government must pay just compensation when it takes a lien—a right to receive money that is secured by a particular piece of property. See *Armstrong* v. *United States*, 364 U. S. 40, 44–49 (1960); *Louisville Joint Stock Land Bank* v. *Radford*, 295 U. S. 555, 601–602 (1935); *United States* v. *Security Industrial Bank*, 459 U. S. 70, 77–78 (1982); see also *Palm Beach Cty.* v. *Cove Club Investors Ltd.*, 734 So. 2d 379, 383–384 (1999) (the right to receive income from land is an interest in real property under Florida law). The fulcrum this case turns on is the

direct link between the government's demand and a specific parcel of real property.[2]  Because of that direct link, this case implicates the central concern of *Nollan* and *Dolan*: the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property.

In this case, moreover, petitioner does not ask us to hold that the government can commit a *regulatory* taking by directing someone to spend money.  As a result, we need not apply *Penn Central*'s "essentially ad hoc, factual inquir[y]," 438 U. S., at 124, at all, much less extend that "already difficult and uncertain rule" to the "vast category of cases" in which someone believes that a regulation is too costly.  *Eastern Enterprises*, 524 U. S., at 542 (opinion of KENNEDY, J.).  Instead, petitioner's claim rests on the more limited proposition that when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a "*per se* [takings] approach" is the proper mode of analysis under the Court's precedent. *Brown* v. *Legal Foundation of Wash.*, 538 U. S. 216, 235 (2003).

Finally, it bears emphasis that petitioner's claim does not implicate "normative considerations about the wisdom of government decisions."  *Eastern Enterprises*, 524 U. S.,

---

[2] Thus, because the proposed offsite mitigation obligation in this case was tied to a particular parcel of land, this case does not implicate the question whether monetary exactions must be tied to a particular parcel of land in order to constitute a taking.  That is so even when the demand is considered "*outside* the permitting process." *Post,* at 8 (KAGAN, J., dissenting).  The unconstitutional conditions analysis requires us to set aside petitioner's *permit application*, not his ownership of a particular parcel of real property.

at 545 (opinion of KENNEDY, J.). We are not here con-
cerned with whether it would be "arbitrary or unfair" for
respondent to order a landowner to make improvements
to public lands that are nearby. *Id.*, at 554 (BREYER, J.,
dissenting). Whatever the wisdom of such a policy, it
would transfer an interest in property from the landowner
to the government. For that reason, any such demand
would amount to a *per se* taking similar to the taking of an
easement or a lien. Cf. *Dolan*, 512 U. S., at 384; *Nollan*,
483 U. S., at 831.

B

Respondent and the dissent argue that if monetary
exactions are made subject to scrutiny under *Nollan* and
*Dolan*, then there will be no principled way of distinguish-
ing impermissible land-use exactions from property taxes.
See *post,* at 9–10. We think they exaggerate both the
extent to which that problem is unique to the land-use
permitting context and the practical difficulty of distin-
guishing between the power to tax and the power to take
by eminent domain.

It is beyond dispute that "[t]axes and user fees . . . are
not 'takings.'" *Brown, supra,* at 243, n. 2 (SCALIA, J.,
dissenting). We said as much in *County of Mobile* v. *Kim-
ball*, 102 U. S. 691, 703 (1881), and our cases have been
clear on that point ever since. *United States* v. *Sperry
Corp.*, 493 U. S. 52, 62, n. 9 (1989); see *A. Magnano Co.* v.
*Hamilton*, 292 U. S. 40, 44 (1934); *Dane* v. *Jackson*, 256
U. S. 589, 599 (1921); *Henderson Bridge Co.* v. *Henderson
City*, 173 U. S. 592, 614–615 (1899). This case therefore
does not affect the ability of governments to impose prop-
erty taxes, user fees, and similar laws and regulations
that may impose financial burdens on property owners.

At the same time, we have repeatedly found takings
where the government, by confiscating financial obliga-
tions, achieved a result that could have been obtained by

imposing a tax. Most recently, in *Brown*, *supra,* at 232, we were unanimous in concluding that a State Supreme Court's seizure of the interest on client funds held in escrow was a taking despite the unquestionable constitutional propriety of a tax that would have raised exactly the same revenue. Our holding in *Brown* followed from *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156 (1998), and *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith*, 449 U. S. 155 (1980), two earlier cases in which we treated confiscations of money as takings despite their functional similarity to a tax. Perhaps most closely analogous to the present case, we have repeatedly held that the government takes property when it seizes liens, and in so ruling we have never considered whether the government could have achieved an economically equivalent result through taxation. *Armstrong*, 364 U. S. 40; *Louisville Joint Stock Land Bank*, 295 U. S. 555.

Two facts emerge from those cases. The first is that the need to distinguish taxes from takings is not a creature of our holding today that monetary exactions are subject to scrutiny under *Nollan* and *Dolan*. Rather, the problem is inherent in this Court's long-settled view that property the government could constitutionally demand through its taxing power can also be taken by eminent domain.

Second, our cases show that teasing out the difference between taxes and takings is more difficult in theory than in practice. *Brown* is illustrative. Similar to respondent in this case, the respondents in *Brown* argued that extending the protections of the Takings Clause to a bank account would open a Pandora's Box of constitutional challenges to taxes. Brief for Respondents Washington Legal Foundation et al. 32 and Brief for Respondent Justices of the Washington Supreme Court 22, in *Brown* v. *Legal Foundation of Wash.*, O. T. 2002, No. 01–1325. But also like respondent here, the *Brown* respondents never claimed that they were exercising their power to levy

taxes when they took the petitioners' property. Any such argument would have been implausible under state law; in Washington, taxes are levied by the legislature, not the courts. See 538 U. S., at 242, n. 2 (SCALIA, J., dissenting).

The same dynamic is at work in this case because Florida law greatly circumscribes respondent's power to tax. See Fla. Stat. Ann. §373.503 (authorizing respondent to impose ad valorem tax on properties within its jurisdiction); §373.109 (authorizing respondent to charge permit application fees but providing that such fees "shall not exceed the cost . . . for processing, monitoring, and inspecting for compliance with the permit"). If respondent had argued that its demand for money was a tax, it would have effectively conceded that its denial of petitioner's permit was improper under Florida law. Far from making that concession, respondent has maintained throughout this litigation that it considered petitioner's money to be a substitute for his deeding to the public a conservation easement on a larger parcel of undeveloped land.[3]

This case does not require us to say more. We need not decide at precisely what point a land-use permitting charge denominated by the government as a "tax" becomes "so arbitrary . . . that it was not the exertion of taxation but a confiscation of property." *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1, 24–25 (1916). For present purposes, it suffices to say that despite having long recognized that "the power of taxation should not be confused with the

_____

[3] Citing cases in which state courts have treated similar governmental demands for money differently, the dissent predicts that courts will "struggle to draw a coherent boundary" between taxes and excessive demands for money that violate *Nollan* and *Dolan. Post,* at 9–10. But the cases the dissent cites illustrate how the frequent need to decide whether a particular demand for money qualifies as a tax under state law, and the resulting state statutes and judicial precedents on point, greatly reduce the practical difficulty of resolving the same issue in federal constitutional cases like this one.

power of eminent domain," *Houck* v. *Little River Drainage Dist*., 239 U. S. 254, 264 (1915), we have had little trouble distinguishing between the two.

C

Finally, we disagree with the dissent's forecast that our decision will work a revolution in land use law by depriving local governments of the ability to charge reasonable permitting fees. *Post,* at 8. Numerous courts—including courts in many of our Nation's most populous States—have confronted constitutional challenges to monetary exactions over the last two decades and applied the standard from *Nollan* and *Dolan* or something like it. See, *e.g., Northern Ill. Home Builders Assn.* v. *County of Du Page*, 165 Ill. 2d. 25, 31–32, 649 N. E. 2d 384, 388–389 (1995); *Home Builders Assn.* v. *Beavercreek*, 89 Ohio St. 3d 121, 128, 729 N. E. 2d 349, 356 (2000); *Flower Mound*, 135 S. W. 3d, at 640–641. Yet the "significant practical harm" the dissent predicts has not come to pass. *Post,* at 8. That is hardly surprising, for the dissent is correct that state law normally provides an independent check on excessive land use permitting fees. *Post,* at 11.

The dissent criticizes the notion that the Federal Constitution places any meaningful limits on "whether one town is overcharging for sewage, or another is setting the price to sell liquor too high." *Post,* at 9. But only two pages later, it identifies three constraints on land use permitting fees that it says the Federal Constitution imposes and suggests that the additional protections of *Nollan* and *Dolan* are not needed. *Post,* at 11. In any event, the dissent's argument that land use permit applicants need no further protection when the government demands money is really an argument for overruling *Nollan* and *Dolan*. After all, the Due Process Clause protected the Nollans from an unfair allocation of public burdens, and they too could have argued that the govern-

ment's demand for property amounted to a taking under
the *Penn Central* framework.  See *Nollan*, 483 U. S., at
838.  We have repeatedly rejected the dissent's contention
that other constitutional doctrines leave no room for the
nexus and rough proportionality requirements of *Nollan*
and *Dolan*.  Mindful of the special vulnerability of land
use permit applicants to extortionate demands for money,
we do so again today.

*          *          *

We hold that the government's demand for property
from a land-use permit applicant must satisfy the re-
quirements of *Nollan* and *Dolan* even when the govern-
ment denies the permit and even when its demand is for
money.  The Court expresses no view on the merits of
petitioner's claim that respondent's actions here failed to
comply with the principles set forth in this opinion and
those two cases.  The Florida Supreme Court's judgment is
reversed, and this case is remanded for further proceed-
ings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 11–1447

———————

## COY A. KOONTZ, JR., PETITIONER *v.* ST. JOHNS RIVER WATER MANAGEMENT DISTRICT

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF FLORIDA

[June 25, 2013]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE SOTOMAYOR join, dissenting.

In the paradigmatic case triggering review under *Nollan* v. *California Coastal Comm'n*, 483 U. S. 825 (1987), and *Dolan* v. *City of Tigard*, 512 U. S. 374 (1994), the government approves a building permit on the condition that the landowner relinquish an interest in real property, like an easement. The significant legal questions that the Court resolves today are whether *Nollan* and *Dolan* also apply when that case is varied in two ways. First, what if the government does not approve the permit, but instead demands that the condition be fulfilled before it will do so? Second, what if the condition entails not transferring real property, but simply paying money? This case also raises other, more fact-specific issues I will address: whether the government here imposed any condition at all, and whether petitioner Coy Koontz suffered any compensable injury.

I think the Court gets the first question it addresses right. The *Nollan-Dolan* standard applies not only when the government approves a development permit conditioned on the owner's conveyance of a property interest (*i.e.*, imposes a condition subsequent), but also when the government denies a permit until the owner meets the condition (*i.e.*, imposes a condition precedent). That

means an owner may challenge the denial of a permit on the ground that the government's condition lacks the "nexus" and "rough proportionality" to the development's social costs that *Nollan* and *Dolan* require.  Still, the condition-subsequent and condition-precedent situations differ in an important way.  When the government grants a permit subject to the relinquishment of real property, and that condition does not satisfy *Nollan* and *Dolan*, then the government has taken the property and must pay just compensation under the Fifth Amendment.  But when the government denies a permit because an owner has refused to accede to that same demand, nothing has actually been taken.  The owner is entitled to have the improper condition removed; and he may be entitled to a monetary remedy created by state law for imposing such a condition; but he cannot be entitled to constitutional compensation for a taking of property.  So far, we all agree.

Our core disagreement concerns the second question the Court addresses.  The majority extends *Nollan* and *Dolan* to cases in which the government conditions a permit not on the transfer of real property, but instead on the payment or expenditure of money.  That runs roughshod over *Eastern Enterprises* v. *Apfel*, 524 U. S. 498 (1998), which held that the government may impose ordinary financial obligations without triggering the Takings Clause's protections.  The boundaries of the majority's new rule are uncertain.  But it threatens to subject a vast array of land-use regulations, applied daily in States and localities throughout the country, to heightened constitutional scrutiny.  I would not embark on so unwise an adventure, and would affirm the Florida Supreme Court's decision.

I also would affirm for two independent reasons establishing that Koontz cannot get the money damages he seeks.  First, respondent St. Johns River Water Management District (District) never demanded *anything* (including money) in exchange for a permit; the *Nollan-Dolan*

standard therefore does not come into play (even assuming that test applies to demands for money). Second, no taking occurred in this case because Koontz never acceded to a demand (even had there been one), and so no property changed hands; as just noted, Koontz therefore cannot claim just compensation under the Fifth Amendment. The majority does not take issue with my first conclusion, and affirmatively agrees with my second. But the majority thinks Koontz might still be entitled to money damages, and remands to the Florida Supreme Court on that question. I do not see how, and expect that court will so rule.

## I

Claims that government regulations violate the Takings Clause by unduly restricting the use of property are generally "governed by the standards set forth in *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104 (1978)." *Lingle* v. *Chevron U. S. A. Inc.*, 544 U. S. 528, 538 (2005). Under *Penn Central*, courts examine a regulation's "character" and "economic impact," asking whether the action goes beyond "adjusting the benefits and burdens of economic life to promote the common good" and whether it "interfere[s] with distinct investment-backed expectations." *Penn Central*, 438 U. S., at 124. That multi-factor test balances the government's manifest need to pass laws and regulations "adversely affect[ing]. . . economic values," *ibid.*, with our longstanding recognition that some regulation "goes too far," *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393, 415 (1922).

Our decisions in *Nollan* and *Dolan* are different: They provide an independent layer of protection in "the special context of land-use exactions." *Lingle,* 544 U. S., at 538. In that situation, the "government demands that a landowner dedicate an easement" or surrender a piece of real property "as a condition of obtaining a development permit." *Id.,* at 546. If the government appropriated such a

property interest outside the permitting process, its action would constitute a taking, necessitating just compensation. *Id.,* at 547. *Nollan* and *Dolan* prevent the government from exploiting the landowner's permit application to evade the constitutional obligation to pay for the property. They do so, as the majority explains, by subjecting the government's demand to heightened scrutiny: The government may condition a land-use permit on the relinquishment of real property only if it shows a "nexus" and "rough proportionality" between the demand made and "the impact of the proposed development." *Dolan*, 512 U. S., at 386, 391; see *ante*, at 8. *Nollan* and *Dolan* thus serve not to address excessive regulatory burdens on land use (the function of *Penn Central*), but instead to stop the government from imposing an "unconstitutional condition"— a requirement that a person give up his constitutional right to receive just compensation "in exchange for a discretionary benefit" having "little or no relationship" to the property taken. *Lingle*, 544 U. S., at 547.

Accordingly, the *Nollan-Dolan* test applies only when the property the government demands during the permitting process is the kind it otherwise would have to pay for—or, put differently, when the appropriation of that property, outside the permitting process, would constitute a taking. That is why *Nollan* began by stating that "[h]ad California simply required the Nollans to make an easement across their beachfront available to the public . . . , rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking" requiring just compensation. 483 U. S., at 831. And it is why *Dolan* started by maintaining that "had the city simply required petitioner to dedicate a strip of land . . . for public use, rather than conditioning the grant of her permit to [d]evelop her property on such a dedication, a taking would have occurred." 512 U. S., at 384. Even the majority acknowledges this

basic point about *Nollan* and *Dolan*: It too notes that those cases rest on the premise that "if the government had directly seized the easements it sought to obtain through the permitting process, it would have committed a *per se* taking." *Ante*, at 14–15. Only if that is true could the government's demand for the property force a landowner to relinquish his constitutional right to just compensation.

Here, Koontz claims that the District demanded that he spend money to improve public wetlands, not that he hand over a real property interest. I assume for now that the District made that demand (although I think it did not, see *infra*, at 12–16.) The key question then is: Independent of the permitting process, does requiring a person to pay money to the government, or spend money on its behalf, constitute a taking requiring just compensation? Only if the answer is yes does the *Nollan-Dolan* test apply.

But we have already answered that question no. *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, as the Court describes, involved a federal statute requiring a former mining company to pay a large sum of money for the health benefits of retired employees. Five Members of the Court determined that the law did not effect a taking, distinguishing between the appropriation of a specific property interest and the imposition of an order to pay money. JUSTICE KENNEDY acknowledged in his controlling opinion that the statute "impose[d] a staggering financial burden" (which influenced his conclusion that it violated due process). *Id.,* at 540 (opinion concurring in judgment and dissenting in part). Still, JUSTICE KENNEDY explained, the law did not effect a taking because it did not "operate upon or alter" a "specific and identified propert[y] or property right[]." *Id.,* at 540–541. Instead, "[t]he law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so." *Id.,* at 540. JUSTICE BREYER, writing for

four more Justices, agreed. He stated that the Takings Clause applies only when the government appropriates a "specific interest in physical or intellectual property" or "a specific, separately identifiable fund of money"; by contrast, the Clause has no bearing when the government imposes "an ordinary liability to pay money." *Id.,* at 554–555 (dissenting opinion).

Thus, a requirement that a person pay money to repair public wetlands is not a taking. Such an order does not affect a "specific and identified propert[y] or property right[]"; it simply "imposes an obligation to perform an act" (the improvement of wetlands) that costs money. *Id.,* at 540–541 (opinion of KENNEDY, J.). To be sure, when a person spends money on the government's behalf, or pays money directly to the government, it "will reduce [his] net worth"—but that "can be said of any law which has an adverse economic effect" on someone. *Id.*, at 543. Because the government is merely imposing a "general liability" to pay money, *id.,* at 555 (BREYER, J., dissenting)—and therefore is "indifferent as to how the regulated entity elects to comply or the property it uses to do so," *id.,* at 540 (opinion of KENNEDY, J.)—the order to repair wetlands, viewed independent of the permitting process, does not constitute a taking. And that means the order does not trigger the *Nollan-Dolan* test, because it does not force Koontz to relinquish a constitutional right.

The majority tries to distinguish *Apfel* by asserting that the District's demand here was "closely analogous" (and "bears resemblance") to the seizure of a lien on property or an income stream from a parcel of land. *Ante*, at 16, 19. The majority thus seeks support from decisions like *Armstrong* v. *United States*, 364 U. S. 40 (1960), where this Court held that the government effected a taking when it extinguished a lien on several ships, and *Palm Beach Cty.* v. *Cove Club Investors Ltd.*, 734 So. 2d 379 (1999), where the Florida Supreme Court held that the government

committed a taking when it terminated a covenant entitling the beneficiary to an income stream from a piece of land.

But the majority's citations succeed only in showing what this case is *not*. When the government dissolves a lien, or appropriates a determinate income stream from a piece of property—or, for that matter, seizes a particular "bank account or [the] accrued interest" on it—the government indeed takes a "specific" and "identified property interest." *Apfel*, 524 U. S., at 540–541 (opinion of KENNEDY, J.). But nothing like that occurred here. The District did not demand any particular lien, or bank account, or income stream from property. It just ordered Koontz to spend or pay money (again, assuming it ordered anything at all). Koontz's liability would have been the same whether his property produced income or not—*e.g.*, even if all he wanted to build was a family home. And similarly, Koontz could meet that obligation from whatever source he chose—a checking account, shares of stock, a wealthy uncle; the District was "indifferent as to how [he] elect[ed] to [pay] or the property [he] use[d] to do so." *Id.,* at 540. No more than in *Apfel*, then, was the (supposed) demand here for a "specific and identified" piece of property, which the government could not take without paying for it. *Id.,* at 541.

The majority thus falls back on the sole way the District's alleged demand related to a property interest: The demand arose out of the permitting process for Koontz's land. See *ante*, at 16–17. But under the analytic framework that *Nollan* and *Dolan* established, that connection alone is insufficient to trigger heightened scrutiny. As I have described, the heightened standard of *Nollan* and *Dolan* is not a freestanding protection for land-use permit applicants; rather, it is "a special application of the doctrine of unconstitutional conditions, which provides that the government may not require a person to give up a

constitutional right—here the right to receive just compensation when property is taken"—in exchange for a land-use permit. *Lingle*, 544 U. S., at 547 (internal quotation marks omitted); see *supra,* at 3–5. As such, *Nollan* and *Dolan* apply only if the demand at issue would have violated the Constitution independent of that proposed exchange. Or put otherwise, those cases apply only if the demand would have constituted a taking when executed *outside* the permitting process. And here, under *Apfel*, it would not.[1]

The majority's approach, on top of its analytic flaws, threatens significant practical harm. By applying *Nollan* and *Dolan* to permit conditions requiring monetary payments—with no express limitation except as to taxes— the majority extends the Takings Clause, with its notoriously "difficult" and "perplexing" standards, into the very heart of local land-use regulation and service delivery. 524 U. S., at 541. Cities and towns across the nation impose many kinds of permitting fees every day. Some enable a government to mitigate a new development's impact on the community, like increased traffic or pollution—or destruction of wetlands. See, *e.g., Olympia* v. *Drebick*, 156 Wash. 2d 289, 305, 126 P. 3d 802, 809 (2006). Others cover the direct costs of providing services like sewage or

——————

[1] The majority's sole response is that "the unconstitutional conditions analysis requires us to set aside petitioner's *permit application*, not his ownership of a particular parcel of real property." *Ante,* at 17, n. 1. That mysterious sentence fails to make the majority's opinion cohere with the unconstitutional conditions doctrine, as anyone has ever known it. That doctrine applies only if imposing a condition directly— *i.e.*, independent of an exchange for a government benefit—would violate the Constitution. Here, *Apfel* makes clear that the District's condition would not do so: The government may (separate and apart from permitting) require a person—whether Koontz or anyone else—to pay or spend money without effecting a taking. The majority offers no theory to the contrary: It does not explain, as it must, why the District's condition was "unconstitutional."

water to the development. See, *e.g., Krupp* v. *Brecken-ridge Sanitation Dist.*, 19 P. 3d 687, 691 (Colo. 2001). Still others are meant to limit the number of landowners who engage in a certain activity, as fees for liquor licenses do. See, *e.g., Phillips* v. *Mobile*, 208 U. S. 472, 479 (1908); *BHA Investments, Inc.* v. *Idaho*, 138 Idaho 348, 63 P. 3d 474 (2003). All now must meet *Nollan* and *Dolan*'s nexus and proportionality tests. The Federal Constitution thus will decide whether one town is overcharging for sewage, or another is setting the price to sell liquor too high. And the flexibility of state and local governments to take the most routine actions to enhance their communities will diminish accordingly.

That problem becomes still worse because the majority's distinction between monetary "exactions" and taxes is so hard to apply. *Ante*, at 18. The majority acknowledges, as it must, that taxes are not takings. See *ibid.* (This case "does not affect the ability of governments to impose prop-erty taxes, user fees, and similar laws and regulations that may impose financial burdens on property owners"). But once the majority decides that a simple demand to pay money—the sort of thing often viewed as a tax—can count as an impermissible "exaction," how is anyone to tell the two apart? The question, as JUSTICE BREYER's opinion in *Apfel* noted, "bristles with conceptual difficulties." 524 U. S., at 556. And practical ones, too: How to separate orders to pay money from . . . well, orders to pay money, so that a locality knows what it can (and cannot) do. State courts sometimes must confront the same question, as they enforce restrictions on localities' taxing power. And their decisions—contrary to the majority's blithe assertion, see *ante*, at 20–21—struggle to draw a coherent boundary. Because "[t]here is no set rule" by which to determine "in which category a particular" action belongs, *Eastern Di-versified Properties, Inc.* v. *Montgomery Cty.*, 319 Md. 45, 53, 570 A. 2d 850, 854 (1990), courts often reach opposite

conclusions about classifying nearly identical fees.  Compare, *e.g., Coulter* v. *Rawlins*, 662 P. 2d 888, 901–904 (Wyo. 1983) (holding that a fee to enhance parks, imposed as a permit condition, was a regulatory exaction), with *Home Builders Assn.* v. *West Des Moines*, 644 N. W. 2d 339, 350 (Iowa 2002) (rejecting *Coulter* and holding that a nearly identical fee was a tax).[2]  Nor does the majority's opinion provide any help with that issue: Perhaps its most striking feature is its refusal to say even a word about how to make the distinction that will now determine whether a given fee is subject to heightened scrutiny.

Perhaps the Court means in the future to curb the intrusion into local affairs that its holding will accomplish; the Court claims, after all, that its opinion is intended to have only limited impact on localities' land-use authority.  See *ante*, at 8, 21.  The majority might, for example, approve the rule, adopted in several States, that *Nollan* and *Dolan* apply only to permitting fees that are imposed ad hoc, and not to fees that are generally applicable.  See, *e.g., Ehrlich* v. *Culver City*, 12 Cal. 4th 854, 911 P. 2d 429 (1996).  *Dolan* itself suggested that limitation by underscoring that there "the city made an adjudicative decision to condition petitioner's application for a building permit on an individual parcel," instead of imposing an "essentially legislative determination[] classifying entire areas of the city."  512 U. S., at 385.  Maybe today's majority accepts that distinction; or then again, maybe not.  At the least, the majority's refusal "to say more" about the scope of its new rule now casts a cloud on every decision by every local government to require a person seeking a permit to pay or spend money.  *Ante*, at 20.

———————

[2] The majority argues that existing state-court precedent will "greatly reduce the practical difficulty" of developing a uniform standard for distinguishing taxes from monetary exactions in federal constitutional cases.  *Ante*, at 20, n.2.  But how are those decisions to perform that feat if they themselves are all over the map?

At bottom, the majority's analysis seems to grow out of a yen for a prophylactic rule: Unless *Nollan* and *Dolan* apply to monetary demands, the majority worries, "land-use permitting officials" could easily "evade the limitations" on exaction of real property interests that those decisions impose. *Ante*, at 15. But that is a prophylaxis in search of a problem. No one has presented evidence that in the many States declining to apply heightened scrutiny to permitting fees, local officials routinely short-circuit *Nollan* and *Dolan* to extort the surrender of real property interests having no relation to a development's costs. See, *e.g., Krupp* v. *Breckenridge Sanitation Dist.*, 19 P. 3d, at 697; *Home Builders Assn. of Central Arizona* v. *Scottsdale*, 187 Ariz. 479, 486, 930 P. 2d 993, 1000 (1997); *McCarthy* v. *Leawood*, 257 Kan. 566, 579, 894 P. 2d 836, 845 (1995). And if officials were to impose a fee as a contrivance to take an easement (or other real property right), then a court could indeed apply *Nollan* and *Dolan*. See, *e.g., Norwood* v. *Baker*, 172 U. S. 269 (1898) (preventing circumvention of the Takings Clause by prohibiting the government from imposing a special assessment for the full value of a property in advance of condemning it). That situation does not call for a rule extending, as the majority's does, to *all* monetary exactions. Finally, a court can use the *Penn Central* framework, the Due Process Clause, and (in many places) state law to protect against monetary demands, whether or not imposed to evade *Nollan* and *Dolan*, that simply "go[] too far." *Mahon*, 260 U. S., at 415; see *supra,* at 3.[3]

————————

[3] Our *Penn Central* test protects against regulations that unduly burden an owner's use of his property: Unlike the *Nollan-Dolan* standard, that framework fits to a T a complaint (like Koontz's) that a permitting condition makes it inordinately expensive to develop land. And the Due Process Clause provides an additional backstop against excessive permitting fees by preventing a government from conditioning a land-use permit on a monetary requirement that is "basically

In sum, *Nollan* and *Dolan* restrain governments from using the permitting process to do what the Takings Clause would otherwise prevent—*i.e.*, take a specific property interest without just compensation. Those cases have no application when governments impose a general financial obligation as part of the permitting process, because under *Apfel* such an action does not otherwise trigger the Takings Clause's protections. By extending *Nollan* and *Dolan*'s heightened scrutiny to a simple payment demand, the majority threatens the heartland of local land-use regulation and service delivery, at a bare minimum depriving state and local governments of "necessary predictability." *Apfel*, 524 U. S., at 542 (opinion of KENNEDY, J.). That decision is unwarranted—and deeply unwise. I would keep *Nollan* and *Dolan* in their intended sphere and affirm the Florida Supreme Court.

## II

I also would affirm the judgment below for two independent reasons, even assuming that a demand for money can trigger *Nollan* and *Dolan*. First, the District never demanded that Koontz give up anything (including money) as a condition for granting him a permit.[4] And second,

---

arbitrary." *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 557–558 (1998) (BREYER, J., dissenting). My point is not, as the majority suggests, that these constraints do the same thing as *Nollan* and *Dolan*, and so make those decisions unnecessary. See *ante*, at 21. To the contrary, *Nollan* and *Dolan* provide developers with enhanced protection (and localities with correspondingly reduced flexibility). See *supra,* at 8. The question here has to do not with "overruling" those cases, but with extending them. *Ante*, at 21. My argument is that our prior caselaw struck the right balance: heightened scrutiny when the government uses the permitting process to demand property that the Takings Clause protects, and lesser scrutiny, but a continuing safeguard against abuse, when the government's demand is for something falling outside that Clause's scope.

[4] The Court declines to consider whether the District demanded anything from Koontz because the Florida Supreme Court did not reach the

because (as everyone agrees) no actual taking occurred, Koontz cannot claim just compensation even had the District made a demand. The majority nonetheless re- mands this case on the theory that Koontz might still be entitled to money damages. I cannot see how, and so would spare the Florida courts.

A

*Nollan* and *Dolan* apply only when the government makes a "demand[]" that a landowner turn over property in exchange for a permit. *Lingle*, 544 U. S., at 546. I understand the majority to agree with that proposition: After all, the entire unconstitutional conditions doctrine, as the majority notes, rests on the fear that the govern- ment may use its control over benefits (like permits) to "coerc[e]" a person into giving up a constitutional right. *Ante,* at 7; see *ante,* at 13. A *Nollan-Dolan* claim therefore depends on a showing of government coercion, not rele- vant in an ordinary challenge to a permit denial. See *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U. S. 687, 703 (1999) (*Nollan* and *Dolan* were "not designed to address, and [are] not readily applicable to," a claim based on the mere "denial of [a] development" permit). Before applying *Nollan* and *Dolan*, a court must find that the permit denial occurred because the government made a demand of the landowner, which he rebuffed.

And unless *Nollan* and *Dolan* are to wreck land-use permitting throughout the country—to the detriment of both communities and property owners—that demand must be unequivocal. If a local government risked a law- suit every time it made a suggestion to an applicant about

———————

issue. See *ante,* at 13. But because the District raised this issue in its brief opposing certiorari, Brief in Opposition 14–18, both parties briefed and argued it on the merits, see Brief for Respondent 37–43; Reply Brief 7–8, Tr. of Oral Arg. 7–12, 27–28, 52–53, and it provides yet another ground to affirm the judgment below, I address the question.

how to meet permitting criteria, it would cease to do so; indeed, the government might desist altogether from communicating with applicants. That hazard is to some extent baked into *Nollan* and *Dolan*; observers have wondered whether those decisions have inclined some local governments to deny permit applications outright, rather than negotiate agreements that could work to both sides' advantage. See W. Fischel, Regulatory Takings 346 (1995). But that danger would rise exponentially if something less than a clear condition—if each idea or proposal offered in the back-and-forth of reconciling diverse interests—triggered *Nollan-Dolan* scrutiny. At that point, no local government official with a decent lawyer would have a conversation with a developer. Hence the need to reserve *Nollan* and *Dolan*, as we always have, for reviewing only what an official demands, not all he says in negotiations.

With that as backdrop, consider how this case arose. To arrest the loss of the State's rapidly diminishing wetlands, Florida law prevents landowners from filling or draining any such property without two permits. See *ante,* at 2–3. Koontz's property qualifies as a wetland, and he therefore needed the permits to embark on development. His applications, however, failed the District's preliminary review: The District found that they did not preserve wetlands or protect fish and wildlife to the extent Florida law required. See App. Exh. 19–20, 47. At that point, the District could simply have denied the applications; had it done so, the *Penn Central* test—not *Nollan* and *Dolan*—would have governed any takings claim Koontz might have brought. See *Del Monte Dunes*, 526 U. S., at 702–703.

Rather than reject the applications, however, the District suggested to Koontz ways he could modify them to meet legal requirements. The District proposed reducing the development's size or modifying its design to lessen the impact on wetlands. See App. Exh. 87–88, 91–92.

Alternatively, the District raised several options for "off-site mitigation" that Koontz could undertake in a nearby nature preserve, thus compensating for the loss of wetlands his project would cause. *Id.,* at 90–91. The District never made any particular demand respecting an off-site project (or anything else); as Koontz testified at trial, that possibility was presented only in broad strokes, "[n]ot in any great detail." App. 103. And the District made clear that it welcomed additional proposals from Koontz to mitigate his project's damage to wetlands. See *id.*, at 75. Even at the final hearing on his applications, the District asked Koontz if he would "be willing to go back with the staff over the next month and renegotiate this thing and try to come up with" a solution. *Id.,* at 37. But Koontz refused, saying (through his lawyer) that the proposal he submitted was "as good as it can get." *Id.*, at 41. The District therefore denied the applications, consistent with its original view that they failed to satisfy Florida law.

In short, the District never made a demand or set a condition—not to cede an identifiable property interest, not to undertake a particular mitigation project, not even to write a check to the government. Instead, the District suggested to Koontz several non-exclusive ways to make his applications conform to state law. The District's only hard-and-fast requirement was that Koontz do something—anything—to satisfy the relevant permitting criteria. Koontz's failure to obtain the permits therefore did not result from his refusal to accede to an allegedly extortionate demand or condition; rather, it arose from the legal deficiencies of his applications, combined with his unwillingness to correct them *by any means.* *Nollan* and *Dolan* were never meant to address such a run-of-the-mill denial of a land-use permit. As applications of the unconstitutional conditions doctrine, those decisions require a condition; and here, there was none.

Indeed, this case well illustrates the danger of extending

*Nollan* and *Dolan* beyond their proper compass. Consider the matter from the standpoint of the District's lawyer. The District, she learns, has found that Koontz's permit applications do not satisfy legal requirements. It can deny the permits on that basis; or it can suggest ways for Koontz to bring his applications into compliance. If every suggestion could become the subject of a lawsuit under *Nollan* and *Dolan*, the lawyer can give but one recommendation: Deny the permits, without giving Koontz any advice—even if he asks for guidance. As the Florida Supreme Court observed of this case: Were *Nollan* and *Dolan* to apply, the District would "opt to simply deny permits outright without discussion or negotiation rather than risk the crushing costs of litigation"; and property owners like Koontz then would "have no opportunity to amend their applications or discuss mitigation options." 77 So. 3d 1220, 1231 (2011). Nothing in the Takings Clause requires that folly. I would therefore hold that the District did not impose an unconstitutional condition—because it did not impose a condition at all.

B

And finally, a third difficulty: Even if (1) money counted as "specific and identified propert[y]" under *Apfel* (though it doesn't), and (2) the District made a demand for it (though it didn't), (3) Koontz never paid a cent, so the District took nothing from him. As I have explained, that third point does not prevent Koontz from suing to invalidate the purported demand as an unconstitutional condition. See *supra,* at 1–2. But it does mean, as the majority agrees, that Koontz is not entitled to just compensation under the Takings Clause. See *ante*, at 11. He may obtain monetary relief under the Florida statute he invoked only if it authorizes damages *beyond* just compensation for a taking.

The majority remands that question to the Florida

Supreme Court, and given how it disposes of the other issues here, I can understand why. As the majority indicates, a State could decide to create a damages remedy not only for a taking, but also for an unconstitutional conditions claim predicated on the Takings Clause. And that question is one of state law, which we usually do well to leave to state courts.

But as I look to the Florida statute here, I cannot help but see yet another reason why the Florida Supreme Court got this case right. That statute authorizes damages only for "an unreasonable exercise of the state's police power constituting a taking without just compensation." Fla. Stat. §373.617 (2010); see *ante,* at 12. In what legal universe could a law authorizing damages only for a "taking" also provide damages when (as all agree) no taking has occurred? I doubt that inside-out, upside-down universe is the State of Florida. Certainly, none of the Florida courts in this case suggested that the majority's hypothesized remedy actually exists; rather, the trial and appellate courts imposed a damages remedy on the mistaken theory that there *had* been a taking (although of exactly what neither was clear). See App. to Pet. for Cert. C–2; 5 So. 3d 8, 8 (2009). So I would, once more, affirm the Florida Supreme Court, not make it say again what it has already said—that Koontz is not entitled to money damages.

## III

*Nollan* and *Dolan* are important decisions, designed to curb governments from using their power over land-use permitting to extract for free what the Takings Clause would otherwise require them to pay for. But for no fewer than three independent reasons, this case does not present that problem. First and foremost, the government commits a taking only when it appropriates a specific property interest, not when it requires a person to pay or spend

money.   Here, the District never took or threatened
such an interest; it tried to extract from Koontz solely a
commitment to spend money to repair public wetlands.
Second, *Nollan* and *Dolan* can operate only when the
government makes a demand of the permit applicant;
the decisions' prerequisite, in other words, is a condition.
Here, the District never made such a demand: It informed
Koontz that his applications did not meet legal require-
ments; it offered suggestions for bringing those applica-
tions into compliance; and it solicited further proposals
from Koontz to achieve the same end.  That is not the stuff
of which an unconstitutional condition is made.   And
third, the Florida statute at issue here does not, in any
event, offer a damages remedy for imposing such a condi-
tion.  It provides relief only for a consummated taking,
which did not occur here.

  The majority's errors here are consequential.  The ma-
jority turns a broad array of local land-use regulations into
federal constitutional questions.   It deprives state and
local governments of the flexibility they need to enhance
their communities—to ensure environmentally sound and
economically productive development.   It places courts
smack in the middle of the most everyday local govern-
ment activity.  As those consequences play out across the
country, I believe the Court will rue today's decision.  I
respectfully dissent.