IN THE COURT OF APPEALS OF NORTH CAROLINA

Nos. COA19-533, COA19-534

Filed: 31 December 2020

Harnett County, Nos. 17 CVS 363, 17 CVS 1361

ANDERSON CREEK PARTNERS, L.P.; ANDERSON CREEK INN, LLC; ANDERSON CREEK DEVELOPERS, LLC; FAIRWAY POINT, LLC; STONE CROSS, LLC d/b/a STONE CROSS ESTATES, LLC; RALPH HUFF HOLDINGS, LLC; WOODSHIRE PARTNERS, LLC; CRESTVIEW DEVELOPMENT, LLC; OAKMONT DEVELOPMENT PARTNERS, LLC; WELLCO CONTRACTORS, INC.; NORTH SOUTH PROPERTIES, LLC; W.S. WELLONS CORPORATION; ROLLING SPRINGS WATER COMPANY, INC.; and STAFFORD LAND COMPANY, INC., Plaintiffs,

v.

COUNTY OF HARNETT, Defendant.


PF DEVELOPMENT GROUP, LLC, Plaintiff,

v.

COUNTY OF HARNETT, Defendant.


Consolidated appeal by Plaintiffs from order entered 26 November 2018 by Judge Michael J. O'Foghludha in Superior Court, Harnett County.  Heard in the Court of Appeals 6 February 2020.

> *Ferguson, Hayes, Hawkins & Demay, PLLC, by James R. DeMay, and Scarbrough & Scarbrough, PLLC, by James E. Scarbrough, Madeline J. Trilling, and John F. Scarbrough, for Plaintiffs-Appellants.*
>
> *Fox Rothschild LLP, by Kip David Nelson, Bradley M. Risinger, and Troy D. Shelton, and Christopher Appel, for Defendant-Appellee.*


McGEE, Chief Judge.

Plaintiffs Anderson Creek Partners, L.P., et al. ("Anderson Creek"), and PF Development Group, LLC ("PF Development") (together, the "Developers"), each brought suit seeking refunds for fees paid to Defendant Harnett County (the "County") for water and sewer services "to be furnished" to their future real estate developments. Each of the two cases was designated to be an exceptional civil case and the two cases were consolidated for a single decision in the trial court, as well as consolidated for appeal to this Court.

The Developers appeal from the 26 November 2018 order of the trial court granting the County's motion for judgment on the pleadings. The Developers contend that (1) the trial court erred by taking judicial notice of an interlocal agreement between the County and its water and sewer districts; (2) the pleadings presented material issues of fact with respect to whether the County was authorized to charge fees for services "to be furnished;" and (3) the pleadings presented a viable unconstitutional conditions claim.

We hold (1) that the trial court did not err in taking judicial notice of the interlocal agreements because the agreements are public documents; (2) there were no issues of material fact in the pleadings with respect to whether the County had authority to charge prospective fees; and (3) the capacity use fees collected by the County are not subject to review under the unconstitutional conditions doctrine. We affirm the trial court's order.

## I. Factual and Procedural Background

### A. *Interlocal Agreements and Assessment of Fees*

The Harnett County Board of Commissioners created a water and sewer district in Buies Creek (the "Buies Creek District") to collect wastewater within the district. The County and the Buies Creek District entered into an interlocal agreement in 1984 (the "1984 Buies Creek Agreement"), whereby the County agreed to operate the Buies Creek District's water and sewer system. The 1984 Buies Creek Agreement was the subject of the North Carolina Supreme Court decision in *McNeill v. Harnett County*, 327 N.C. 552, 398 S.E.2d 475 (1990). In *McNeil*, the North Carolina Supreme Court held that counties could lawfully enter into and act upon an interlocal agreement to operate a water and sewer system on behalf of a water and sewer district, and could exercise the water and sewer district's "rights, powers, and functions" in carrying out those operations. *Id.* at 559–60, 398 S.E.2d at 479.

By 1998, the County created eight water and sewer districts (the "Districts") to manage wastewater across its entire jurisdiction. The County and the Districts then entered into a joint interlocal agreement in May 1998 (the "1998 Agreement"), whereby the County agreed to administer the Districts' water and sewer systems. Per the 1998 Agreement, the County and the Districts agreed that the County would lease the Districts' property; the Districts would transfer their intangible assets to the County; the County would assume most of the Districts' liabilities; and the

County would "administer all operations and maintenance" of the Districts' water and sewer systems.

The County then incorporated its duties under the 1998 Agreement into the Harnett County Water and Sewer Ordinance (the "Ordinance"). *See* Harnett County, N.C., Water and Sewer Ordinance (July 1, 2016) [hereinafter, Ordinance]. Pursuant to section 28(h) of the Ordinance, the County charges landowners "capacity use" fees (the "Fees") for future water or sewer service as a mandatory condition prior to the County issuing approvals and/or permits for developments to real property. Ordinance § 28(h). The Fees for a single-family residential lot are a one-time, non-negotiable payment of $1,000 for water and $1,200 for sewer. Ordinance § 28(h).

B. *Anderson Creek's Case*

The Developers each sought to build a number of residences in the County in or around 2017. Cumulatively, the County required the Developers to pay over $25,000 in Fees prior to issuing its approval for the Developers' proposed plans.

Anderson Creek filed a complaint against the County on 1 March 2017. The complaint initially alleged six claims for relief, requesting:

> (1) a declaration that the Ordinance and Fees were unlawful because the County exceeded its authority under N.C. Gen. Stat. § 153-277 in adopting and enforcing the Ordinance and Fees, and/or because the Fees lacked an "essential nexus" and "rough proportionality" to the impact of the proposed developments on the County's water and sewer systems;

(2) a declaration that the Ordinance and Fees violated the Developers' rights to equal protection and substantive due process under Article I, Section 19 of the North Carolina Constitution;

(3) a refund to the Developers of all fees exacted by the County, together with interest at the rate of 6% per annum pursuant to N.C. Gen. Stat. § 153A-324;

(4) an award of costs, expenses, and attorneys' fees pursuant to N.C. Gen. Stat. § 6-21.7 and/or other applicable law;

(5) an accounting of all fees exacted by the County from the Developers; and

(6) an order allowing any future Fees required to be paid into escrow pending the litigation resolution.

The County filed an amended[1] answer, counterclaims, and motion for sanctions in response to Anderson Creek's complaint on 19 May 2017. Anderson Creek then filed a motion to amend its complaint on 23 August 2017. The trial court granted the motion, and Anderson Creek filed an amendment to its complaint asserting a seventh and eighth claim for relief:

> (7) alleging that the County breached the terms of a 4 April 2018 agreement with Anderson Creek, specifically; and

> (8) requesting a declaration regarding the severability of a provision of the agreement with Anderson Creek relating to the payment of fees from Anderson Creek's development properties.

---

[1] The County's original answer, counterclaims, and motion for sanctions is not included in the record on appeal.

The Anderson Creek case was designated an exceptional civil case under Rule 2.1 of the General Rules of Practice for the Superior and District Courts on 27 September 2017 and was reassigned to another Superior Court Judge in Chatham County.

The County filed an answer and counterclaim in response to Anderson Creek's amended complaint on 1 February 2018.[2]  The County's counterclaim requested a declaration that the 1998 Agreement gave the County authority to collect fees through the Ordinance.

On 12 February 2018, the County filed a Rule 12(c) motion for judgment on the pleadings as to claims 1 through 6 and 8 of Anderson Creek's amended complaint, and filed a motion to join necessary parties or, in the alternative, motion for permissive joinder of parties.  The County attached to its motions the 1984 Buies Creek Agreement at issue in *McNeill*, as well as the subsequent 1998 Agreement. The motions were heard at the 6 August 2018 civil session of Chatham County, Superior Court.

C.  *PF Development's Case*

---

[2] The record indicates that the trial court did not grant Anderson Creek's motion to amend its complaint until 22 February 2018 and that Anderson Creek's amended complaint was not filed until 16 March 2018.  According to these filing dates, the County filed its answer, counterclaims, and motion for judgment on the pleadings in response to Anderson Creek's amended complaint over one week before the trial court granted the motion to amend and over a month before the amended complaint was filed.  Nevertheless, the County's answer, counterclaims, and motions evidence its receipt of the amended complaint and the parties do not bring any arguments regarding the timeliness or authenticity of the amended complaint.

PF Development's complaint was filed against the County on 19 July 2017. Six claims for relief were alleged in PF Development's complaint. These claims were identical to the claims raised in Anderson's Creek initial complaint. The County filed an answer denying the material allegations of the complaint and a counterclaim for declaratory relief on 9 October 2017. PF Development filed a reply to the counterclaim on 9 November 2017.

The County filed a Rule 12(c) motion for judgment on the pleadings as to all six of PF Development's claims, and a motion to join necessary parties or, in the alternative, motion for permissive joinder of parties on 12 February 2018. The PF Development case was designated an exceptional civil case on 4 October 2018 and also reassigned to the same Superior Court Judge in Chatham County.

D. *Consolidation for Decision and Appeal*

The Developers initially filed a motion to consolidate their cases before the trial court on 30 January 2018. After consideration of the pleadings, arguments of counsel at the 6 August 2018 hearing in Anderson Creek's case, and materials submitted to the trial court, the trial court informed the Developers that the County's Rule 12(c) motion would be partially allowed in Anderson Creek's case. The Developers again filed a joint consent motion to consolidate their cases with the trial court on 5 October 2018. The trial court entered an order granting the consent motion to consolidate on 26 November 2018. The parties to the PF Development case elected to accept the

result of the Anderson Creek case and did not request additional oral argument for PF Development's case.

On 26 November 2018, the trial court entered an order (the "Consolidated Order") resolving each case, granting: (1) in the Anderson Creek case, the County's motion for judgment on the pleadings on claims 1 through 6 and 8 and dismissing each with prejudice; and (2) in the PF Development case, the County's motion for judgment on the pleadings on all claims and dismissing all with prejudice. The Consolidated Order noted that the court had "taken judicial notice of public documents appended to [the County's] Rule 12(c) Motion [] which are May 1998 and July 1984 Agreements entered into among and between [the County] and other North Carolina governmental units that are relevant to the matters involved in this action." The Consolidated Order also stated that the County's motions to join necessary parties or, in the alternative, motions for permissive joinder of parties in each of the Developers' cases were moot based on its decision. The Developers filed a consolidated notice of appeal on 21 December 2018.

## II. Analysis

### A. *Judicial Notice of Public Contracts*

We first address the Developers' argument that the trial court erred by (1) taking judicial notice of the 1984 Buies Creek Agreement and the 1998 Agreement, each of which the County attached to its motion for judgment on the pleadings, and

(2) considering the documents in the determination of its Consent Order. The Developers contend that the Consent Order is, "in essence, a motion for summary judgment by ambush" because they were not "afford[ed] an opportunity to reasonably confront these documents." Essentially, the Developers claim that they were unduly surprised by the County's presentation of the agreements, and placed in the "untenable position" of having to "defend matters external to the allegations of their Complaint[.]" We disagree.

The Developers are correct that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56[.]" N.C. Gen. Stat. § 1A-1, Rule 12 (2017). However, in deciding a Rule 12(c) motion for judgment on the pleadings, our Court has held that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, *and matters of which a court may take judicial notice.*" *QUB Studios, LLC, v. Marsh*, 262 N.C. App. 251, 260, 822 S.E.2d 113, 120–21 (2018) (emphasis added) (adopting the United States Supreme Court's language in *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 168 L. Ed. 2d 179, 193 (2007)). To be clear, a court may take judicial notice of matters

outside the pleadings, where appropriate, without causing the proceeding to convert from a Rule 12(c) motion to one for summary judgment under Rule 56. *Id.*

Judicial notice is appropriate where a fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." N.C. Gen. Stat. § 8C-1, Rule 201 (2017). North Carolina Courts have long held that "important public documents will be judicially noticed." *State ex rel. Utils. Comm'n v. S. Bell Tel. & Tel. Co.*, 289 N.C. 286, 287, 221 S.E.2d 322, 323 (1976) (citing *Staton v. Atl. Coast Line Rail Co.*, 144 N.C. 135, 145, 56 S.E. 794, 797 (1907)). "Important public documents" in this context have been held to include, among other things, a Utilities Commission order modifying a joint venture agreement, *Town of Midland v. Morris*, 209 N.C. App. 208, 214, 704 S.E.2d 329, 335 (2011); a vehicle insurance classification scheme composed by the North Carolina Rate Bureau, *State ex rel. Com'r of Ins. v. N.C. Auto. Rate Admin. Office*, 293 N.C. 365, 381, 239 S.E.2d 48, 58 (1977); and contractual agreements between a Native American tribe and both the state government and private entities, *Hatcher v. Harrah's N.C. Casino Co., LLC*, 169 N.C. App. 151, 154, 610 S.E.2d 210, 212 (2005). "[A] trial court's decision concerning judicial notice will not be overturned absent an abuse of discretion." *Muteff v. Invacare Corp.*, 218 N.C. App. 558, 568, 721 S.E.2d 379, 386 (2012) (citation omitted).

The 1984 Buies Creek Agreement and the 1998 Agreement are public contracts between government entities, Harnett County and its municipal water and sewer districts. *See* N.C. Gen. Stat. § 132-1 (2017) (defining documents created by municipalities, counties, and special districts "in connection with the transaction of public business" to be public records). These documents are subject to public review, N.C. Gen. Stat. § 132-1, and their existence is therefore "not subject to reasonable dispute." The agreements are important public documents germane to the resolution of this case; indeed, some of the Developers reference—or even incorporate—the 1998 Agreement in their pleadings. The Developers' position was far from "untenable." The trial court took judicial notice of the existence of the agreements and of the language therein, then interpreted that language as a matter of law. It was, therefore, not an abuse of discretion for the trial court to take judicial notice of the 1984 Buies Creek Agreement and the 1998 Agreement and to consider the documents in its review of the parties' pleadings.

B. *Preemptive Collection of Fees*

The Developers primarily contend that the trial court erred in granting the County's motion for judgment on the pleadings because the pleadings presented material issues of fact with respect to whether the County had authorization to prospectively collect fees for water and sewer services "to be furnished" in the future.

- 11 -

We hold that the County had authority to collect prospective fees by virtue of the 1998 Agreement.

### i. *Standard of Review*

"We review de novo a trial court's order granting a motion for judgment on the pleadings under Rule of Civil Procedure 12(c)." *Tully v. City of Wilmington*, 370 N.C. 527, 532, 810 S.E.2d 208, 213 (2018) (citation omitted). The moving party must show that, after considering all well-pleaded factual allegations in the nonmoving party's pleadings as true, "no material issue of fact exists and that he is entitled to judgment as a matter of law." *Id.* A defendant moving for judgment on the pleadings must prove, essentially, that the plaintiff's pleadings "fail[] to allege facts sufficient to state a cause of action or admit[] facts which constitute a complete legal bar to a cause of action." *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51–52, 790 S.E.2d 657, 659–60 (2016) (citations and quotation marks omitted).

This case also requires our review of two interlocal agreements between the parties. "Generally, 'the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument.'" *China Grove 152, LLC, v. Town of China Grove*, 242 N.C. App. 1, 9, 773 S.E.2d 566, 572 (2015) (citation omitted).

### ii. *Authorization to Collect Prospective Fees*

A clear understanding of the question before us first requires discussion of the statutes and seminal cases which comprise the relevant fee-collecting authority of the municipal entities involved. Municipalities are entities born purely from "legislative will" and have no authority or powers apart from those given to them by the General Assembly. *Lutterloh v. City of Fayetteville*, 149 N.C. 65, 69, 62 S.E. 758, 760 (1908) (citations omitted). The General Assembly allows for the creation of municipalities and expressly delegates powers and authorities to them via enabling statutes. N.C. Const. art. VII, § 1; *Lanvale Props., LLC, v. County of Cabarrus*, 366 N.C. 142, 150, 731 S.E.2d 800, 807 (2012) (citations omitted). Acts taken by a municipality that extend beyond the scope of the powers and authorities statutorily granted to it are void. *City of Asheville v. Herbert*, 190 N.C. 732, 735, 130 S.E. 861, 863 (1925) (citations omitted).

When the Developers sought development permits in early 2017, the County had the statutory authority only to collect fees for past and present "services furnished." The governing statute then stated:

> A county may establish and revise from time to time schedules of rents, rates, fees, charges, and penalties for the use of or *the services furnished* by a public enterprise.

N.C. Gen. Stat. § 153A-277(a) (2015) (emphasis added).

The North Carolina Supreme Court held that a nearly identical statute regarding the fee-collecting authorities of cities did not authorize the collection of

prospective impact fees in its 2016 decision in *Quality Built Homes Inc. v. Town of Carthage*, 369 N.C. 15, 789 S.E.2d 454 (2016). In *Quality Built Homes*, the town of Carthage required developers to pay a progressively scaling fee prior to final approval of the developers' plats and building permits. *Id.* at 17, 789 S.E.2d at 456. Carthage claimed authority to charge these prospective fees under N.C. Gen. Stat. § 160A-314, which then read:

> A city may establish and revise from time to time schedules
> of rents, rates, fees, charges, and penalties for the use of or
> *the services furnished* by a public enterprise.

N.C. Gen. Stat. § 160A-314 (2015) (emphasis added). Our Supreme Court held the plain language of N.C. Gen. Stat. § 160A-314 "clearly and unambiguously empower[ed] Carthage to charge for the contemporaneous use of water and sewer services—*not* to collect fees for future [] spending." *Id.* at 20, 789 S.E.2d at 458 (emphasis added) (citation omitted). The statute's provisions were "operative in the present tense." *Id.*

Our Court addressed similar language enabling a utilities commission to collect fees in *Kidd Construction Group, LLC, v. Greenville Utilities Commission*, ___ N.C. App. ___, 845 S.E.2d 797 (2020). In *Kidd*, the Greenville Utilities Commission (the "GUC"), a local government entity created by our General Assembly to provide water and sewer services to Pitt County, collected prospective capacity fees "as a precondition to development approval, to the issuance of building permits, and to

receiving service." *Id.* at ___, 845 S.E.2d at 799. The charter establishing creation of the GUC and outlining its powers authorized the GUC to "fix uniform rates for *all services rendered*[.]" *Id.* at ___, 845 S.E.2d at 801. This Court held that the operative language in GUC's charter was "functionally equivalent" and "nearly identical" to the enabling language at issue in *Quality Built Homes*, and "also fail[ed] to confer prospective charging authority by lacking the critical 'to be' language." *Id.* ("Just as the 'services furnished' language did not empower Carthage to impose impact fees prior to any service being provided, so too does 'services rendered' fail to empower GUC to impose impact fees on builders and developers as a condition of final development approval." (citation omitted)).

The only difference between the text of N.C. Gen. Stat. § 160A-314 reviewed in *Quality Built Homes* and the text of N.C. Gen. Stat. § 153A-277(a) subject to our review in this case is the substitution of the word "city" for "county." We interpret the nearly identical, plain language of N.C. Gen. Stat. § 153A-277(a) in the same manner. N.C. Gen. Stat. § 153A-277(a) authorized the County only to assess fees for the "contemporaneous use" of its water and sewer systems, and otherwise "clearly and unambiguously fail[ed] to give [the County] the essential prospective charging power necessary to assess [the Fees]." *Quality Built Homes*, 369 N.C. at 22, 789 S.E.2d at 459.

- 15 -

In response to the *Quality Built Homes* decision, our General Assembly modified both N.C. Gen. Stat. § 153A-277(a) and N.C. Gen. Stat. § 160A-314 to authorize counties and cities to collect fees for "services furnished or to be furnished by any public enterprise." N.C. Gen. Stat. § 153A-277(a) (2019); N.C. Gen. Stat. § 160A-314 (2019). The General Assembly thus amended each statute to permit the prospective fee-collecting acts complained of here. The amended language of N.C. Gen. Stat. § 153A-277(a) became effective 1 October 2017; however, the General Assembly specified that "[n]othing in th[e] act provides retroactive authority for any system development fee, or any similar fee for water or sewer services to be furnished, collected by a local governmental unit prior to October 1, 2017." PUBLIC WATER AND SEWER SYSTEM DEVELOPMENT FEE ACT, 2017 North Carolina Laws S.L. 2017-138 (H.B. 436).

The Districts, on the other hand, were authorized to collect prospective fees in 2016. Each of the Districts involved in this case are water and sewer districts created under chapter 162A of the North Carolina General Statutes and governed by the Harnett County Board of Commissioners. Water and sewer districts are bodies corporate and politic which are and were, at all times relevant to this case, authorized to "contract and be contracted with" and to "establish, revise and collect rates, fees or other charges and penalties for the use of or the services furnished or *to be furnished*[.]" N.C. Gen. Stat. § 162A-88 (2015) (emphasis added). Unlike the versions

of N.C. Gen. Stat. §§ 153A-277 and 160A-314 in effect when the Developers were required to pay the Fees, N.C. Gen. Stat. § 162A-88 "included the language 'services furnished and to be furnished' and thus 'plainly allowed the charge for prospective services[.]'" *Kidd*, ___ N.C. App. at ___, 845 S.E.2d at 800 (quoting *Quality Built Homes*, 369 N.C. at 20, 789 S.E.2d at 458) (distinguishing N.C. Gen. Stat. § 160A-314 (2015) and N.C. Gen. Stat. § 162A-88 (2015)).

Additionally, local government entities may generally cooperate through interlocal agreements to carry out their purposes. *See* N.C. Gen. Stat. §§ 153A-275, 153A-278 (2015). Our Supreme Court has made it clear that a county may contract with another local government entity to enable the county to exercise authority given to that entity. Specifically, this issue has been addressed with respect to the County and its water and sewer districts. In *McNeil v. Harnett County*, our Supreme Court held that the 1984 Buies Creek Agreement—the prior interlocal agreement between the County and the Buies Creek District, one of the Districts in this case—properly enabled the County to exercise all "rights, powers, and functions granted to water and sewer districts as found in N.C.G.S. § 162A-88[.]" *McNeill*, 327 N.C. at 559, 398 S.E.2d at 479.

At all times relevant to this action, counties did not have the authority to collect prospective fees themselves. However, the Districts each had the authority to collect prospective fees and were free to contract with the County to enable the

County to collect prospective fees by exercising the statutory authority of the Districts. Therefore, the only way the County could have had the authority to charge any prospective fees would be pursuant to an interlocal agreement through which the County could exercise authority held by the Districts.[3]

### iii. Issues of Fact

Having explained that the County may only collect fees for services "to be furnished" by virtue of an interlocal agreement granting such rights, the question before this Court is whether the 1998 Agreement did grant the County the Districts' authority to collect prospective fees under N.C. Gen. Stat. § 162A-88.

In *McNeil*, our Supreme Court held that the County could lawfully enter into and act under an interlocal agreement to operate a water and sewer system on behalf of its water and sewer districts:

> [P]ursuant to an interlocal cooperative agreement and pursuant to authority granted in article 15 of chapter 153A, a county may, among other things, operate a water and/or sewer system for and on behalf of another unit of local government, such as a water and sewer district, and in conjunction therewith may exercise those rights, powers, and functions granted to water and sewer districts as found in N.C.G.S. § 162A-88 and those rights, powers, and

---

[3] We note that the impact fees charged in *Quality Built Homes* were assessed on a progressively scaling basis, whereas the Fees charged by the County in the present case are flat and non-negotiable charges which the County deems "capacity use" fees. This difference is not material to our consideration of the County's prospective fee-collecting authority. The Fees charged by the County here are "not assessed at the time of actual use, but are payable in full at the time of final subdivision plat approval—a time when water, sewer, or other infrastructure might not have been built and only a recorded plat exists" and "requir[e] [the County] to invoke prospective charging power" for future services. *Quality Built Homes,* 369 N.C. at 21, 789 S.E.2d at 458–59 (quotation marks and brackets omitted).

functions granted to counties in N.C.G.S. ch. 153A, art. 15. *McNeil*, 327 N.C. at 559, 398 S.E.2d at 479. The *McNeil* Court recognized that the County and the Buies Creek District had entered into the 1984 Buies Creek Agreement "on 23 July 1984 wherein it was agreed that the [Buies Creek District's] sewer system, which had been completed that year, would be operated by Harnett County through its Department of Public Utilities." *Id.* The *McNeil* Court held that, pursuant to the 1984 Buies Creek Agreement, the County was "clothed" with "those powers granted to the [Buies Creek District] in N.C.G.S. § 162A-88[,]" as well as "those powers set forth in chapter 153A, article 15 of the General Statutes[.]" *Id.* Therefore, the 1984 Buies Creek Agreement granted the County the power, among other things, to "establish, revise and collect rates, fees or other charges and penalties for the use of or the services furnished or *to be furnished* by any sanitary sewer system, water system or sanitary sewer and water system" and to "exercise those powers[.]" N.C. Gen. Stat. § 162A-88 (emphasis added); *McNeil*, 327 N.C. at 559, 398 S.E.2d at 479.

The terms of the 1984 Buies Creek Agreement stated, in relevant part, that the County and the Buies Creek District "agreed to enter into [the] contract for . . . the operation of the wastewater collection system as a County operated sewer and wastewater collection system[.]" The contract provided that a newly constructed "wastewater treatment plant owned by the County" would be operated by the County

to serve the sewer and wastewater needs of the Buies Creek District. In so doing, the County was "entitled to fund or cause to be funded the construction of any sewer line to be connected to the [Buies Creek District's] system as an extension . . . for the purpose of serving needy users with wastewater utility services[.]" Notably, the 1984 Buies Creek Agreement made no direct reference to N.C. Gen. Stat. § 162A-88.

The 1998 Agreement provides the County with substantially the same rights as it was granted in the 1984 Buies Creek Agreement and more clearly incorporates the Districts' prospective fee-collecting authority. The 1998 Agreement opens by acknowledging that it exists pursuant to statutory authority, which includes a number of statutes "[w]ithout limitation." The enumerated statutory authorities include the authority of "two or more . . . units of local government [to] cooperate" in the "joint provision of enterprisory services" as granted by N.C. Gen. Stat. § 153A-278. The 1998 Agreement then expressly recognizes that the Districts have the ability to assess fees for "services furnished or to be furnished" pursuant to N.C. Gen. Stat. § 162A-88. In a section labeled "Purpose of the Agreement," the 1998 Agreement states that its purpose is to "provide a cost efficient method for the administration, operation, maintenance and expansion of water and . . . wastewater services to each of the Districts through [the County's] Department of Public Utilities." Like the 1984 Buies Creek Agreement, the 1998 Agreement does not make a specific reference to the County's receipt of the Districts' authority to collect prospective fees, but does

wholly acknowledge an intent between the parties to have the County step into the Districts' shoes to efficiently provide water and sewer services throughout each District. We therefore hold that the 1998 Agreement granted the County the ability to exercise the Districts' prospective fee-collecting authority, and that the pleadings failed to present a material issue of fact regarding the County's authority to collect prospective fees.

The Developers' argue that this case turns, instead, on a different issue: whether the pleadings show a material issue of fact regarding how the County assessed the Fees, either by managing the Districts' infrastructure or by operating its own county infrastructure. In the Developers' view, this case presents a "complex puzzle regarding the Ordinance, the Fees, and the true relationship of the County and the Districts in the provision of water and sewer service." The Developers contend the County had no authority to collect the Fees because "[t]he clear inference from the [1998 Agreement] is that the County is operating its own, countywide water and sewer system—not the systems of the Districts."

We disagree with the Developers' statement of the issue in this case. The pleadings may show an issue of fact with respect to whose infrastructure the County used to assess the Fees, and whether the District even maintained any water and sewer system of its own, but these issues are not material to the resolution of this case. Regardless of whether the County is operating its own physical water and sewer

infrastructure, the Districts' infrastructure, infrastructure it acquired from the Districts, or a combination thereof, the issue is whether the County had the authority to use any means to assess prospective fees for water and sewer services to be furnished in the future.[4] Indeed, the *McNeil* Court found that the County had this authority where the 1984 Buies Creek Agreement specified that the County would operate a "wastewater treatment plant owned by the County" and a "wastewater treatment facility owned by the County[,]" which were located within the boundaries of the Buies Creek District and thereafter referred to as "the [Buies Creek District's] wastewater collection system" and "the [Buies Creek District's] wastewater treatment facility[.]" It was immaterial to the holding of *McNeil* that the County owned the infrastructure used. We hold that the 1998 Agreement gave the County the rights to exercise the Districts' fee-collecting authority—by any legal means—and therefore affirm the Consolidated Order.

---

[4] After hearing arguments from counsel regarding the County's motion for judgment on the pleadings, the trial court properly understood the issue in this case to be the same:

> Legally, it doesn't matter how they do it; legally, it matters can they legally do it? But, how they do it doesn't matter. Isn't that kind of irrelevant?
> . . . .
> They have to have the authority, but, as long as they continue to have the authority, that's—that's the legal threshold issue.
> . . . .
> [T]he threshold issue for me to decide in this case is whether the [1998 Agreement] is legally—legally different than the [1984 Buies Creek Agreement] and *whether the [1998 Agreement] is not done pursuant to [N.C. Gen. Stat. § 162A]*.

(Emphasis added).

C. *Unconstitutional Conditions Doctrine*

Lastly, the Developers argue that the pleadings presented a material issue of fact of whether assessment of the Fees constituted an unconstitutional condition under the United States Supreme Court's decision in *Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 186 L. Ed. 2d 697 (2013). The Developers' pleadings claim that, assuming the County had the authority to assess the Fees, the Fees were nonetheless an unconstitutional condition on the exercise of their property rights. Thus, this Court is asked to determine whether a generally applicable fee assessed as a condition precedent to approval of a land-use permit warrants review under the "unconstitutional conditions doctrine." For the reasons below, we hold that it does not and further affirm the Consolidated Order.

The "unconstitutional conditions doctrine" rests on the principle that "the government may not deny a benefit to a person because he exercises a constitutional right," *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545, 76 L. Ed. 2d 129, 136–37 (1983) (citation omitted), and works to "vindicate[] the Constitution's enumerated rights by preventing the government from coercing people into giving them up[,]" *Koontz*, 570 U.S. at 604, 186 L. Ed. 2d at 708. The United States Supreme Court has held that the unconstitutional conditions doctrine is particularly relevant in the context of the land-use permitting process, as landowners are especially vulnerable to the government's broad discretion in imposing potentially

"[e]xtortionate demands" on the grant of land-use permits. *Koontz,* 570 U.S. at 605, 186 L. Ed. 2d at 708. Government conditions that request the landowner deed land as an easement or designate a portion of his or her land for a particular use "can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation." *Id.*; U.S. Const. amend. V. However, where a landowner's proposed use of real property "threaten[s] to impose costs on the public" the government may constitutionally require the landowner to "internalize the negative externalities of their conduct" and make contributions of real property or finances to mitigate the public costs imposed. *Id.*

The Supreme Court recognized these competing realities in *Nollan v. California Coastal Commission,* 483 U.S. 825, 97 L. Ed. 2d 677 (1987), and *Dolan v. City of Tigar*d, 512 U.S. 374, 129 L. Ed. 2d 304 (1994). In *Nollan* and *Dolan*, the Court ruled that the government is allowed to condition approval of land-use permits by requiring the landowner to mitigate the impact of his or her proposed use. *Dolan,* 512 U.S. at 391, 129 L. Ed. 2d at 320; *Nollan*, 438 U.S. at 837, 97 L. Ed. 2d at 689. The government may require that the landowner agree to a particular public use of the landowner's real property, as long as there is an "essential nexus" and "rough proportionality" between the public impact of the landowner's proposed developments and the government's requirements. *Dolan*, 512 U.S. at 391, 129 L. Ed. 2d at 320; *Nollan,* 438 U.S. at 837, 97 L. Ed. 2d at 689.

In *Koontz*, the Court extended the application of *Nollan/Dolan*'s "essential nexus" and "rough proportionality" requirements to government demands for monetary contributions where there is a "direct link between the government's demand and a specific parcel of real property." *Koontz*, 570 U.S. at 614, 186 L. Ed. 2d at 714 (footnote omitted). The plaintiff in *Koontz* was required to obtain a Wetlands Resource Management Permit before he could make improvements to his property which would, among other impacts, raise the elevation of the improved property. *Id.* at 599–602, 186 L. Ed. 2d at 704–06. The plaintiff offered to deed a portion of his property as a conservation easement to the water district to mitigate the environmental impact of his proposed improvements. *Id.* The water district considered the plaintiff's offer inadequate, and refused to grant the plaintiff's permit unless he either (1) agreed to increase the amount of property encumbered by the proposed conservation easement, or, in the alternative, (2) to deed the conservation easement as offered and to also pay for environmental improvements to district-owned real property several miles away. *Id.* The *Koontz* Court held that the district's second condition also warranted *Nollan/Dolan* review because such demands for money operated, essentially, "in lieu of" relinquishments of real property rights, were therefore "functionally equivalent to other types of land use exactions[,]" and accomplished the same diminution in the landowner's property rights: the landowner

could comply with the request, or be denied the right to use his or real property in the desired way. *Id.* at 612, 186 L. Ed. 2d at 713.

In the case before us, the County assessed the Fees as a condition precedent to its approval of the Developers' building permits; if the Developers declined to pay the Fees, the County would have denied the Developers' permission to begin their desired construction projects. The Fees in this case were categorized as impact fees and referred to as "capacity use fees," despite the County's requirement that the fees be paid prior to approval of a developer's permits.

The *Koontz* Court stressed that taxes and fees do not trigger review under the unconstitutional conditions doctrine, and stated: "It is beyond dispute that '[t]axes and user fees . . . are not "takings."'" *Id.* at 615, 186 L. Ed. 2d at 715 (citation omitted). The *Koontz* Court explained that its holding did "not affect the ability of governments to impose property taxes, user fees, and similar laws and regulations that may impose financial burdens on landowners." *Id.* But the *Koontz* Court otherwise provided little guidance on how courts should tread the fine line between unconstitutional exactions and constitutional, routine taxes and fees. *See* Michael B. Kent, Jr., *Viewing the Supreme Court's Exactions Cases Through the Prism of Anti-Evasion*, 87 U. COLO. L. REV. 827, 871 (2016); Adam Lovelady, The *Koontz* Decision and Implications for Development Exactions, Coates' Canons: N.C. Local Government Law Blog (Dec. 17, 2020), https://canons.sog.unc.edu/the-koontz-decision-and-implications-for-

development-exactions/ (opining that the majority opinion in *Koontz* did not provide a clear test for distinguishing permissible taxes and fees from potentially unconstitutional exactions).  Indeed, the dissenting justices in *Koontz* warned that the majority's decision extended the "notoriously 'difficult' and 'perplexing' standards" of the Fifth Amendment Takings Clause "into the very heart of local land-use regulation and service delivery[,]" including the levy of fees to "cover the direct costs of providing services like sewage or water to [a] development." *Koontz*, 570 U.S. at 626, 186 L. Ed. 2d at 722 (Kagan, J., dissenting) (citations omitted).  The dissenting justices concluded that these fees—such as the Fees at issue in the present case—"now must meet *Nollan* and *Dolan*'s nexus and proportionality tests." *Id.* at 627, 186 L. Ed. 2d at 722.

Neither party in this case briefed any North Carolina precedent, and our own review has found no precedent, which speaks directly to the application of the unconstitutional conditions doctrine to monetary exactions in North Carolina. *Cf. Homebuilders Ass'n of Charlotte, Inc., v. City of Charlotte*, 336 N.C. 37, 46, 442 S.E.2d 45, 51 (1994) (assessing the legality of the city's user fees without reviewing their constitutionality); *River Birch Assocs. v. City of Raleigh*, 326 N.C. 100, 120–22, 388 S.E.2d 538, 550–51 (1990) (applying *Nollan* and holding no constitutional taking occurred where the city required a dedication of real property as condition precedent to permit approval, but the plaintiff's permit was denied for other valid reasons).  At

a minimum, this is the first time North Carolina appellate courts have been asked to address this issue since the United States Supreme Court decided *Koontz* in 2013.

This Court most closely addressed the constitutionality of government exactions in any form as takings in its 1989 decision in *Franklin Road Properties v. City of Raleigh*, 94 N.C. App. 731, 381 S.E.2d 487 (1989). In *Franklin Road*, the city of Raleigh refused to issue building permits for a subdivision requested by the plaintiff because the plaintiff would not comply with city ordinances which required the plaintiff to "dedicate and pave a portion of its property as part of [a] right-of-way" prior to approval of a building permit. *Franklin Rd.*, 94 N.C. App. at 734, 381 S.E.2d at 489. The plaintiff sued seeking a declaratory judgment of its rights with respect to the city ordinances, and the trial court granted summary judgment to the defendant city of Raleigh. *Id.* This Court reviewed the constitutionality of the city ordinance's requirement that the plaintiff dedicate a portion of its land as a public right-of-way. *Id.*

The *Franklin Road* Court concluded that the city ordinance was an "exaction" which required constitutional scrutiny under North Carolina's "rational nexus" test, adopted only six months earlier in the 1989 opinion of *Batch v. Town of Chapel Hill*, 92 N.C. App. 601, 376 S.E.2d 22 (1989), *rev'd*, 326 N.C. 1, 387 S.E.2d 655 (1990). *Id.* at 737, 381 S.E.2d at 491. The *Franklin Road* Court explained:

> In [a] portion of our opinion in *Batch* we concluded that the
> town's requirement that plaintiff dedicate a portion of her

property as a right-of-way for the proposed [parkway] was an "exaction." In defining "exaction" we stated:

[A]n exaction is a condition of development permission that requires a public facility or improvement to be provided at the developer's expense. Most exactions fall into one of four categories: (1) requirements that land be dedicated for street rights-of-way, parks, or utility easements and the like; (2) requirements that improvements be constructed or installed on land so dedicated; (3) requirements that fees be paid *in lieu of* compliance with dedication or improvement provisions; and (4) *requirements that developers pay "impact" or "facility" fees reflecting their respective prorated shares of the cost of providing new roads, utility systems, parks, and similar facilities serving the entire area.*

We further stated that "Not all exactions are constitutional takings." To aid a trial court in determining whether an exaction is an unconstitutional taking, we adopted the following rational nexus test:

To determine whether an exaction amounts to an unconstitutional taking, the court shall: (1) identify the condition imposed; (2) identify the regulation which caused the condition to be imposed; (3) determine whether the regulation substantially advances a legitimate state interest. If the regulation substantially advances a legitimate state interest, the court shall then determine (4) whether the condition imposed advances that interest; and (5) whether the condition imposed is proportionally related to the impact of the development.

*Id.* at 736, 381 S.E.2d at 490 (emphasis added) (citing *Batch*, 92 N.C. App. at 613–14, 621, 376 S.E.2d at 30, 34).

Notably, though, the North Carolina Supreme Court reversed *Batch* a year later, holding that the Town of Chapel Hill properly denied the plaintiff's request for

a subdivision building permit because the permit failed to comply with town ordinances requiring permits to contemplate coordination with the town's transportation plans. *Batch v. Town of Chapel Hill*, 326 N.C. 1, 13, 387 S.E.2d 655, 663 (1990). Based on this holding, the Court declined to address any other reason why the permit was or may have been denied, and, particularly, did "not find it necessary to review or decide any of [the] plaintiff's constitutional claims or other issues arising upon her complaint." *Id.* at 13, 14, 387 S.E.2d at 663.

As a result, North Carolina law in regard to exactions as takings is without foundation and has not been updated following *Dolan* and *Koontz*. The definition of "exaction" and the "rational nexus" test presented in *Franklin Road* (and derived from the Court of Appeals decision in *Batch*) were developed after the United States Supreme Court decided *Nollan*, but prior to its decisions in *Dolan* and *Koontz*. Nonetheless, *Franklin Road* addressed potentially unconstitutional exactions in North Carolina by employing a "rational nexus" test which in many ways mirrors the "essential nexus" and "rough proportionality" requirements of *Nollan/Dolan*, and which also preemptively addressed *Koontz's* later extension of those requirements to monetary exactions "in lieu of" physical takings of land or as recompense for the impact of a proposed development.

The Developers cite to decisions from other states that have issued rulings regarding the thin line between unconstitutional exactions and constitutional user

fees. However, we find most of these cases unpersuasive because they involve these courts' attempts to apply the real property-focused decisions in *Nollan/Dolan* alone to exactions and fees, prior to the United States Supreme Court's decision in *Koontz*. *See Home Builders Ass'n of Dayton & the Miami Valley v. City of Beavercreek*, 729 N.E.2d 349, 356 (Ohio 2000); *Trimen Dev. Co. v. King Cty.*, 877 P.2d 187, 194 (Wash. 1994); *N. Ill. Home Builders Ass'n, Inc. v. Cty. of Du Page*, 621 N.E.2d 1012, 1020 (Ill. App. Ct. 1993), *aff'd in part, rev'd in part*, 649 N.E.2d 384 (Ill. 1995). These cases were part of the pre-*Koontz* division of authority over whether a demand for money could give rise to an unconstitutional conditions claim under *Nollan/Dolan*—a division which *Koontz* settled in the affirmative. *See Koontz*, 570 U.S. at 603, 186 L. Ed. 2d at 707.

The most persuasive case cited by the parties is the 2018 decision of Maryland's highest court in *Dabbs v. Anne Arundel County*, 182 A.3d 798 (Md. 2018), which cites to *Koontz* in holding that a generally applicable fee does not invoke the unconstitutional conditions doctrine. In *Dabbs*, the plaintiffs sought refunds for impact fees paid to their county in connection with real estate developments; the fees were collected to facilitate future improvements to transportation and education infrastructure within the county. *Id.* at 801–02. The impact fees at issue were "legislatively-imposed[,] predetermined, based on a specific monetary schedule, and applie[d] to any person wishing to develop property in the district." *Id.* at 811. The

plaintiffs argued that the impact fees were takings subject to the "essential nexus" and "rough proportionality" requirements of *Nollan/Dolan*. *Id.* at 807–08. The *Dabbs* Court acknowledged that *Koontz* extended the protections of *Nollan/Dolan* to instances where there is a "'*direct link* between the *government's demand* and *a specific parcel of real property*[,]'" but noted *Koontz's* insistence that "'taxes [and] user fees . . . that may impose financial burdens on [land]owners'" are not takings under *Nollan/Dolan*. *Id.* at 809–10 (citing *Koontz*, 570 U.S. at 614, 615, 186 L. Ed. 2d at 714, 715).

The *Dabbs* Court held that the impact fees were not subject to scrutiny under *Nollan/Dolan* because, "[u]nlike *Koontz*, the Ordinance [did] not direct a [land]owner to make a conditional monetary payment to obtain approval of an application for a permit of any particular kind, nor [did] it impose the condition on a particularized or discretionary basis." *Id.* at 811 (citation omitted). Instead, the ordinance at issue in *Dabbs* "applied on a generalized district-wide basis, making no determination as to whether an actual permit will issue to a payor individual with a property interest." *Id.* (citing *Koontz*, 570 U.S. at 628, 186 L. Ed. 2d at 723 (Kagan, J., dissenting) (commenting that the majority's holding should apply "only to permitting fees that are imposed ad hoc, and not to fees that are generally applicable")). The *Dabbs* Court further based its decision on its understanding that *Dolan* recognized that impact fees "imposed on a generally applicable basis are not subject to a rough

proportionality or nexus analysis." *Id.* (citing *Dolan*, 512 U.S. at 385, 129 L. Ed. 2d at 316).

We find the holding of *Dabbs* persuasive and find it in harmony with both the United States Supreme Court's decision in *Koontz* and the definition of "exaction" employed by this Court in *Franklin Road*. In *Franklin Road*, this Court defined "exaction" to include fees assessed "in lieu of compliance with dedication or improvement provisions" or fees "reflecting [developers'] respective prorated shares of the cost of providing new [infrastructure.]" *Franklin Rd.*, 94 N.C. App. at 736, 381 S.E.2d at 490. This definition did not include fees assessed on a generally applicable basis in a static quantity indifferent to the particular developers' prorated share of any resulting impact. We hold that impact and user fees which are imposed by a municipality to mitigate the impact of a developer's use of property, which are generally imposed upon all developers of real property located within that municipality's geographic jurisdiction, and which are consistently imposed in a uniform, predetermined amount without regard to the actual impact of the developers' project do not invoke scrutiny as an unconstitutional condition under *Nollan/Dolan* nor under North Carolina precedent.

The Fees assessed in the present case are similar to those assessed in *Dabbs*. The parties agree that, under Section 28(h) of the Ordinance, any landowner who wishes to develop a single-family residential lot in the County must pay one-time fees

of $1,000 for water and $1,200 for sewer. Ordinance § 28(h). The Fees are predetermined, set out in the Ordinance, and non-negotiable; the Fees are not assessed on an *ad hoc* basis or dependent upon the landowner's particular project. Ordinance § 28(h). The Fees are assessed in conjunction with the landowner's intent to make use of real property located within the County's jurisdiction, but, unlike the conditions imposed in *Koontz*, the County does not view a landowner's proposed project and then make a demand based upon that specific parcel of real property. *Koontz*, 570 U.S. at 613, 186 L. Ed. 2d at 714 (holding *Nollan/Dolan* scrutiny applied where there is a "direct link between the government's demand and a specific parcel of real property").

We recognize that *Dabbs* is distinguishable from the present case in that the Fees here were assessed *prior to* the County's grant of building permits, thus making them a condition of approval. The *Dabbs* Court expressly based its holding, in part, on the fact that the fees at issue were *not* "a conditional monetary payment to obtain approval of an application for a permit of any particular kind[.]" *Dabbs*, 182 A.3d at 811. This distinction speaks directly to the types of coercive harms that the United States Supreme Court sought to prevent in *Koontz*: the unconstitutional conditions doctrine seeks to prevent the government from leveraging its legitimate interest in mitigating harms by imposing "[e]xtortionate demands" which may "pressure a[] [land]owner into voluntarily giving up property for which the Fifth Amendment

would otherwise require just compensation." *Koontz*, 570 U.S. at 605–06, 186 L. Ed. 2d at ___; *but see id.* at 607, 186 L. Ed. 2d at 709 ("Our unconstitutional conditions cases have long refused to attach significance to the distinction between conditions precedent and conditions subsequent." (citation omitted)). Nonetheless, we do not find the distinction material in this case. Regardless of whether the Fees were to be paid prior to or after the Developers began their projects, the fees were predetermined and are uniformly applied—not levied against the Developers on an *ad hoc* basis— and thus do not suggest any intent by the County to bend the will or twist the arm of the Developers.

Therefore, we hold that the Developers' pleadings failed to present a constitutional takings claim under current federal and state unconstitutional conditions jurisprudence as a matter of law. The trial court had no duty to apply the unconstitutional conditions doctrine to the Fees; rather, the court needed only ensure that, if the County "[did] have the authority to assess user fees to defray the costs of [future services to be rendered,] such fees [were not] upheld if they [were] unreasonable." *Homebuilders Ass'n of Charlotte*, 336 N.C. at 46, 442 S.E.2d at 51 (citation omitted).

### III. Conclusion

We hold that the trial court did not abuse its discretion in taking judicial notice of the 1984 Buies Creek Agreement and the 1998 Agreement. Further, we hold that

the 1998 Agreement granted the County the contractual right to exercise the Districts' prospective fee-collecting authority, and the County properly exercised that authority in collecting the Fees. We further hold that the Developers failed to present a viable constitutional claim because generally applicable impact and user fees, such as the Fees in this case, are not subject to the unconstitutional conditions doctrine. We affirm the trial court's Consolidated Order.

AFFIRMED.

Judges STROUD and BROOK concur.